C.4. 11940 PBS

# COMMONWEALTH OF MASSACHUSETTS

Suffolk County, ss.                     Supreme Judicial Court

```
          COMMONWEALTH              Docket No. SJC - 09187
                                             (Bristol County)
              VS.                        SJC - 09212
                                            (Plymouth County)
          STEPHEN CASEY
```

BEFORE:          Chief Justice Margaret H. Marshall
                 Justice John M. Greany,
                 Justice Francis X. Spina,
                 Justice Roderick L. Ireland,
                 Justice Martha B. Sosman,
                 Justice Judith A. Cowin &
                 Justice Robert J. Cordy


APPEARANCES:     Stephen Gagne, Esq. (Bristol County)
                 Caroline Burbine, Esq. (Plymouth County)
                 (for the Commonwealth)

                 Attorney David Lewis
                 (for Stephen Casey)

                 Oral Argument

                 April 5, 2004

**CAMBRIDGE TRANSCRIPTIONS**
675 Massachusetts Avenue
Cambridge, MA 02139
(617) 547 - 5690
www.ctran.com

Commonwealth v. Casey                                          Page 2

**WITNESSES**

|       Witness       |       Direct       |       Cross       |       Re-Direct       |       Re-Cross       |
|---|---|---|---|---|

**Exhibits:**                                                      **Page**

Commonwealth v. Casey                                    Page 3

1                    **P R O C E E D I N G S**

2              MALE:  The order is [inaudible].

3              COURT OFFICER:  Commonwealth vs. Casey.

4              THE COURT:  Mr. Gagne?

5              MR. GAGNE:  Yes.

6              THE COURT:  You have seven and a half minutes, as

7    I understand it.

8              MR. GAGNE:  Thank you, your Honor.

9              THE COURT:  You may proceed.

10             MR. GAGNE:  Thank you.  May I please the court?

11   My name is Steven Gagne.  I represent the Bristol District

12   Attorney's office in this case.  There are two cases

13   consolidated here this morning; one arising from the

14   defendant's conviction in Bristol County, for raping a

15   child, and indecent assault and battery on a person under

16   14.  The other is from the defendant's guilty plea to the

17   same charges in Plymouth County.

18             In 2003, the defendant filed motions for new

19   trial in both counties.  He prevailed in Bristol, he did

20   not in Plymouth, and Bristol County is appealing the

21   allowance of his Motion for a new Trial.  In allowing the

22   Motion, Judge [Chin] focused solely on the fact that during

23   deliberations, somehow the alternate juror made his way

24   into the deliberations room with the jury.

CAMBRIDGE TRANSCRIPTIONS                          APRIL 5, 2004

Commonwealth v. Casey                                    Page 4

1        THE COURT:  Not for very long.

2        THE COURT:  Yeah, he—

3        MR. GAGNE:  He was there for two minutes.

4        THE COURT:  And he asked a question.

5        MR. GAGNE:  He asked a question of some unknown

6   sort.  He was in there for less than one half of one

7   percent of the juror's entire time of deliberations, which

8   was over seven hours.

9        THE COURT:  And for all we know, that question

10  could have been something simple, like, "Am I supposed to

11  be here?"

12        MR. GAGNE:  Precisely, "What time is lunch?"

13        THE COURT:  But even if we assume that it was the

14  absolute worse question that could have been asked, even if

15  we assume, from the [government's] point of view, or from

16  either point of view, if we assume that that [inaudible],

17  shouldn't we find the defendant guilty?

18        MR. GAGNE:  Yes.

19        THE COURT:  There is still no prejudice to the

20  defendant.  There is no effect.  It's meaningless, because

21  three hours later, or four hours later, the jury came out

22  and said that they were nine to three to acquit.  And then

23  three and a half hours later, they were 12-0 to convict.

24  So the juror who was in there for two minutes and asked one

1    question, even if he asked the worst possible question,

2    could not have had any impact on this jury.

3              MR. GAGNE:   The Commonwealth agrees, and for two

4    reasons, this case is distinguishable from Smith, Sheahy

5    and Jones.  First is that it was two minutes, not the

6    entire length of the deliberations, which I believe is the

7    factual scenario in those three cases, and second, we do

8    have this other circumstance, this knowledge which granted,

9    we shouldn't have had.  The jury shouldn't have come back

10   and said "We're nine to three to acquit"—

11             THE COURT:   Mr. Gagne—

12             MR. GAGNE:   But we do know that.

13             THE COURT:   Mr. Gagne, let me ask you this.

14   Let's assume that you were to call back some exceptions,

15   just a minute, it is unlikely that you would have precisely

16   these facts in another case.  So if we are to give

17   prosecutors, and defense counsel, and trial judges

18   guidance, what would the remedies be [to call that] an

19   exception?

20             MR. GAGNE:   I would urge the court to adopt the

21   reasoning in State vs. Kusick, the Supreme Court of

22   Washington, which this court actually did in Smith, where

23   the court said that when there is a substantial intrusion

24   into the deliberations, prejudice should be presumed, and

Commonwealth v. Casey                                    Page 6

1    the defendant does not need to make a showing.  And in that
2    case, the State vs. Kusick, the court also said that in
3    that case where the intrusion involves the physical
4    presence of a non-juror for the full length of
5    deliberations—
6                    THE COURT:  Well that we understand.
7                    MR. GAGNE:  Yes.
8                    THE COURT:  That's easy, I mean, relatively easy.
9    What about a juror who sits there, and indeed, may have
10   participated, not understanding, you know, for some period
11   of time.  Here it seems to be somebody went in, and at the
12   very least, one would hope that the judge could inquire
13   what did you say.
14                   MR. GAGNE:  Yes.
15                   THE COURT:  If his question had been, "Am I
16   supposed to be here?  Do you know where the cafeteria is?"
17   you know—
18                   THE COURT:  Where is my umbrella?  I'm getting my
19   umbrella, it's raining out.
20                   THE COURT:  That's easy.  But let's assume that
21   the jury deliberated here for seven hours, right?
22                   MR. GAGNE:  Yes, over seven.
23                   THE COURT:  Now, let's assume that the juror was
24   there for one hour, and then somebody said "Oops, didn't

Commonwealth v. Casey                                    Page 7

1    realize that the alternate-- Where is the alternate?  Oh

2    my god, it is the alternate who [inaudible] and pulled that

3    juror out."

4              MR. GAGNE:  Yes.  You're saying that that comes

5    under Smith, or not under Smith?  Under that, that would be

6    a more troubling situation.  That would be distinguishable

7    from this case.  I would say the factors to consider would

8    be the length of time that the juror was there, whether the

9    juror said anything during that time, if so, what the juror

10   said, and what curative steps the Judge took when that—

11             THE COURT:  Whether--

12             MR. GAGNE:  --was detected.

13             THE COURT:  --[inaudible] whether the juror said

14   anything during that period of time is really beginning to

15   ask-- And here it seems to me you [inaudible] been able to

16   inquire, because it was so brief.

17             MR. GAGNE:  Yes.

18             THE COURT:  You know, that's the umbrella case.

19             THE COURT:  And here you could inquire without

20   getting the answer.  You could just ask what the question

21   was.

22             MR. GAGNE:  Precisely.

23             THE COURT:  And that way you don't get into the

24   deliberations, you—

1       MR. GAGNE:  Only what the influence was; only

2   what the statement or question was, not how did anyone else

3   react to it, not did anyone answer your question?  Here,

4   that inquiry should have occurred.  That should have

5   occurred—

6       THE COURT:  Let's assume, for example, that what

7   the juror said is, "Haven't you people made up your mind?

8   He's clearly guilty."  That's what he said.  Now you have

9   nine-three voting to acquit, and there turns out to be a

10  conviction.  Could one not argue that while they were in

11  the midst of their later deliberations, somebody said well

12  here is the alternate.  He thought it was a slam dunk case,

13  or she thought it.

14      MR. GAGNE:  Yes.  A statement that biased in one

15  direction, surely I believe could be grounds for

16  [inaudible] in this trial for reversing conviction.  Even

17  if he was only in there for 15 or 20 minutes, but the

18  statement was that—

19      THE COURT:  What if it—

20      MR. GAGNE:  --egregious.

21      THE COURT:  What if the defendant, or the

22  Commonwealth, can go either way?  You know, take it the

23  other way then.  Both people, both party's way.  You know,

24  even if it's an egregious statement, or I think he's

Commonwealth v. Casey                                    Page 9

1   guilty, or you want my initial-- He's in there for five
2   minutes. The chair, the floor person says "All you in
3   favor of convicting" he puts up his hand. Nothing said.
4   The judge has a [inaudible] finds that out and both the
5   Commonwealth and the defendant said "We don't want a
6   mistrial."

7           MR. GAGNE: Well, in that case I would say the
8   defendant had waived his rights. Now, in the case where
9   the alternate is present throughout—

10          THE COURT: That's [inaudible]

11          MR. GAGNE: But doesn't say anything, the
12  defendant can still pursue his rights on appeal, because
13  the prejudice is presumed. But here, if we knew what the
14  nature of the intrusion was and the defendant still waived,
15  then he knows what the influence was. He decides "I'm
16  going to go forward anyway." And in fact here, this error
17  wasn't detected until after the jurors sat from [inaudible]
18  9:00 to 3:00 to acquit. So at this point, the defendant
19  knew, "If I hold on a little longer, perhaps it's an
20  acquittal." He chose to proceed, even knowing that the
21  juror had been in there for the first two minutes, still
22  not knowing what was said during those two minutes. But he
23  went forward, he was ultimately convicted, but now he had
24  the trump card of those two minutes, and he prevailed on

Commonwealth v. Casey                                    Page 10

1    the Motion for a New Trial.

2           So I'd say he really had, he had a win/win

3    situation at that point; no guarantees the judge shouldn't

4    have allowed the Motion for a new Trial, but here, this

5    situation is distinct from Smith, Jones and Sheahy, where

6    the influence cannot be measured.  Even if a person sits

7    there quietly, does not say a word, it's the gestures, the

8    body language, even the rolling of the eyes, which just

9    can't be detected.  And we can't try, in that situation,

10   and truly detect what the nature of the influence was,

11   because it's pervasive throughout.  But here it's two

12   minutes, it's one question, that inquiry should have been

13   made.

14          THE COURT:  Do you, are you saying that we just

15   use how much time passed as a way for informing judges as

16   to whether they should make inquiry or not?

17          MR. GAGNE:  [Yes].

18          THE COURT:  If the alternate is in there for less

19   than an hour?

20          MR. GAGNE:  That's, that's certainly perhaps—

21          THE COURT:  Did he—

22          MR. GAGNE:  That's one of the most significant

23   factors.  But as far as [willing] to draw the line—

24          THE COURT:  [inaudible]

Commonwealth v. Casey                                    Page 11

1        MR. GAGNE:  Ten minutes may not be much in a
2    deliberation of eight hours, but when it's only half an
3    hour—
4        THE COURT:  No.  The [inaudible] be the judge
5    should make the inquiry, what was the extraneous influence.
6        MR. GAGNE:  Yes.
7        THE COURT:  What got said.  What we have here is
8    though, the inquiry was not made, and the defendant made
9    any objection, at the time, [inaudible] stuck with it.
10        THE COURT:  So what would the—
11        MR. GAGNE:  [inaudible]
12        THE COURT:  What would the judge ask?  What did
13    you say?  What was said?
14        MR. GAGNE:  Yes.
15        THE COURT:  Were there any facial movements, any
16    raising of the eyebrows, any—
17        THE COURT:  [inaudible] [said].
18        THE COURT:  Would you go down a checklist?
19        MR. GAGNE:  It would only be what, alternate
20    juror, what did you say during that time?
21        THE COURT:  Yes.
22        MR. GAGNE:  --not asking what reactions they've
23    got.  How long you were in there.  And I would ask, at what
24    point did this occur?  Here it's the first two minutes,

1    where it seems implausible that they were deeply into a
2    substantive analysis of the evidence.  It very well could
3    have been just let's get things organized and started here.
4    And if you look at what the juror tried to say when he was
5    asked if deliberations had begun, he actually began to say
6    "Well no."  And Judge Chin said "No, I don't want to
7    [inaudible] [relate]" but—
8              THE COURT:  But no, but your hypothesis isn't
9    necessarily correct, because some juries, probably more
10   than a few, immediately take a vote.
11             MR. GAGNE:  Sure.
12             THE COURT:  So it could have been in the first
13   two minutes the floor person said "Okay, we'll start by
14   taking a vote" and it could have been the alternate said,
15   "What, what do we need a vote for?  The guy is clearly
16   guilty."  I mean, "Isn't he guilty?"
17             MR. GAGNE:  It's entirely possible that—
18             THE COURT:  I mean, isn't he guilty?
19             MR. GAGNE:  --in the first 30 seconds, an
20   alternate juror's influence could have tainted this juror
21   deliberation.  He could have walked in and said, "Can
22   anyone believe what that defendant just testified to?"
23   That type of question, sure, it could, under certain
24   circumstances.  But here we don't know what the question

Commonwealth v. Casey                                    Page 13

1    was.  We do know it was only two minutes, and halfway

2    through there were nine to three in favor of acquittal

3    [anyway].  But those limited circumstances, I believe the

4    Motion for a New Trial should not have been allowed.

5            And as far as setting a clear standard, this

6    doesn't seem to be a situation that occurs that often.

7    This is a narrow, factual scenario, and under these facts,

8    the motion should not have been allowed.

9            THE COURT:  Thank you.

10           THE COURT:  Before you sit down, I know you

11   [inaudible] I have one question on just one part of this

12   case.

13           THE COURT:  Is that, do you have a [inaudible] in

14   this case?

15           THE COURT:  No, on a different part of this case.

16   Clearly the victim shouldn't have spoken to the victim's

17   um, to the--  The victim shouldn't have spoken to the

18   alternate in the corridor.  This is a different part of

19   this case.

20           MR. GAGNE:  Yes.

21           THE COURT:  But the victim's conversation with

22   the alternate in the corridor, am I correct, was after the

23   alternate had been in the jury room.  Is that correct?

24           MR. GAGNE:  Yes.

Commonwealth v. Casey                                    Page 14

1        THE COURT:  So that, so the alternate had no more

2   contact with the jury after the conversation, therefore,

3   whatever the conversation was between the alternate and the

4   victim couldn't have been brought to the jury's attention,

5   am I right?

6        MR. GAGNE:  It may as well have been a stranger

7   on the street, yes.

8        THE COURT:  Yes, okay.

9        MR. GAGNE:  Yes.

10       THE COURT:  Okay.  I just wanted to be sure.  All

11  right.

12       THE COURT:  Thank you, Mr. Gagne.

13       MR. GAGNE:  Thank you, your Honor[s].

14       THE COURT:  Mr. Lewis?

15       MR. LEWIS:  [inaudible] motions [inaudible]

16  switch back and forth.

17       THE COURT:  Mr. Lewis, you're going to do both

18  cases?

19       MR. LEWIS:  Yes.  May I please the court?  My

20  name is David Lewis.  I represent Mr. Casey on both of

21  these cases.  To address the question that started off the

22  oral argument with Mr. Gagne, Attorney Gagne, you were

23  asking about that clearly, you know, there is this nine to

24  three vote for acquittal after the, after the alternate is

1   in there.  You know, with all due respect, I think it's

2   speculation whether or not that question may have even

3   favored him, because I think it could have gone either way.

4   You have, there is no way of knowing whether that [spurred]

5   the nine people, or [inaudible] in one of the three.  There

6   is no, there is simply no way to know that.

7           I think another point that was addressed in that

8   argument about the fact it was the first two minutes.  I

9   think that's logically fallacious, because it automatically

10  favors the first two minutes over the middle two minutes,

11  or over the last two minutes.  And as you've just pointed

12  out, they may take votes right when they go in.  There may

13  be something—

14          THE COURT:  Mr. Lewis, usually, the point there

15  would be any two minutes.

16          MR. LEWIS:  Right.

17          THE COURT:  That is to say, let's assume that you

18  go through the first five arguments, and then for some

19  reason the alternate juror somehow is back up in the jury

20  room.  I mean, I think, at least in my mind it's two

21  minutes, not--  And then if it's sufficiently discreet,

22  perhaps making the [inaudible] include to find out what was

23  said.

24          MR. LEWIS:  Right.  I mean, I don't think it, I'm

Commonwealth v. Casey                                Page 16

1    saying I don't think it makes a difference which two

2    minutes it is.  I think you have to, once they're

3    deliberated, they're deliberated, and –

4              THE COURT:  But could I ask you, though, as I

5    understand it, by the time this came to the judge's

6    attention, it was at the same time revealed where the vote

7    stood.

8              MR. LEWIS:  I believe they had the note from the

9    jury—

10             THE COURT:  Jury.

11             MR. LEWIS:  --where they stood at the end of the

12   first day—

13             THE COURT:  Right.

14             MR. LEWIS:  --of deliberations.

15             THE COURT:  Okay.

16             MR. LEWIS:  And this was, he found out at the

17   beginning of the second day.

18             THE COURT:  Day.  So by that time, everybody knew

19   that that's where the deliberations stood.

20             MR. LEWIS:  Correct.

21             THE COURT:  The judge made brief inquiry of the

22   juror, but did not, in fact, even allow the juror to state

23   what the juror himself had said in the jury room.

24             MR. LEWIS:  Right.

1        THE COURT:  And defense counsel made no request

2   at that time, "No judge, I want to know what the extraneous

3   influence was."  Given the, on the [odd] facts of this

4   case, can we not view that as a very purposeful, strategic

5   decision that defense counsel didn't want there to be a

6   reason to declare a mistrial, because all of the signals

7   were, which one wouldn't normally have, was that this was

8   headed towards perhaps an acquittal, or in fact, the report

9   had been deadlocked.  So he's already got, [he thinks] he's

10  already got a mistrial.  I might even get an acquittal.  I

11  do not want something now brought to the judge's attention

12  to cause the judge to back off from that.

13       Why shouldn't that be a waiver, a strategic

14  waiver on very peculiar facts, but a very strategic waiver?

15       MR. LEWIS:  I submit that you're giving the trial

16  counsel way too credit, that is not supported by this

17  record.  If, in fact, he was doing, in [logical thinking]

18  if he had known what Smith said, and known what Jones and

19  Sheahy said about lack of waiver, about what they require,

20  known, if he would have known that, supposedly,

21  theoretically, it seems to me in your question he would

22  have known that, and had the sort of cat in the bag, that

23  as soon as the verdict came in, he would have said "Your

24  Honor" or very shortly thereafter, he would have said, "You

Commonwealth v. Casey                              Page 18

1    know something, your honor?  On the break I ran into, I've

2    got these cases.  This is a non-waiverable, [hearsay]

3    reversible error.  There is no requirement I show

4    prejudice.  He was present there.  He was in there during

5    deliberations.  But I submit—

6              THE COURT:  It wasn't his perception about the

7    cases, it was his read of I've got a jury leaning in my

8    favor.  They reported deadlock yesterday, so I'm, you know,

9    I may well just get a deadlock and a mistrial anyway, and I

10   don't want to give up on the possibility of, because it

11   looks like this is headed for an acquittal, and I don't

12   want to lose it.

13             THE COURT:  Yes, the defense attorney doesn't

14   have to know anything about past cases.  All he knows is

15   that right now it's nine to three—

16             THE COURT:  Three.

17             THE COURT:  --in his favor.

18             THE COURT:  He doesn't want a mistrial.

19             THE COURT:  He doesn't want to mess this up, so

20   he doesn't want an inquiry of the juror.  It seems like a

21   clear, strategic decision.

22             MR. LEWIS:  In Smith, I knew [inaudible] Smith,

23   and I can't recollect right now if it was the case in

24   Sheahy, but the defense attorneys in those cases had

1    actually [inaudible] let the alternates in there.  And this
2    court had said "That's no waiver" and had opined [in dicta]
3    I believe it was in Sheahy, said—

4              THE COURT:  No, but it's different from, I think
5    it's different when it's a strategic decision to let it go
6    that way.

7              THE COURT:  Well, they strategically wanted the
8    alternates—

9              MR. LEWIS:  Well—

10             THE COURT:  --in, correct?  In Sheahy, I know in
11   Sheahy, and maybe, well may be in Smith certainly, I don't
12   know.  But I think in both of them.  Defense counsel and
13   the Commonwealth affirmatively had said yes, it's fine.  It
14   wasn't clear to me, by the way, whether they were
15   authorizing him to vote as well.  But if he said let them
16   vote, and we don't have any objections.  I mean, that could
17   be viewed as I have no idea why you want the alternates in,
18   but maybe hoping that the alternates maybe, by body
19   language or something else influenced, who knows?  But that
20   was clearly strategic, right?

21             MR. LEWIS:  What, my case?

22             THE COURT:  No, no, no, in Smith.  And the court
23   said too bad, you can't do it.

24             MR. LEWIS:  Yes.  I think in the case, I think in

1   Smith and Sheahy, I think they just, they agreed to have
2   them in there.  And I don't think there really, there
3   really wasn't much case law in Massachusetts on that point
4   anyway, but it would certainly let them know one way or the
5   other—

6           THE COURT:  Yeah.

7           MR. LEWIS:  You know, how egregious that may have
8   been.  But as far as whether you can let, you know, even if
9   you give them the benefit of the doubt and you say it was a
10  strategic decision, it was in [inaudible] in Sheahy that I
11  think is actually, you know, quite correct.

12          THE COURT:  Right, but—

13          MR. LEWIS:  Because of, because of the nature of
14  the [right] if he should—

15          THE COURT:  But Sheahy and Smith and the others
16  do not have the bizarre fact of the lawyers already knowing
17  where the jury vote stood.  This defense counsel knew it
18  was nine to three in favor of acquittal, what's the chance
19  that the three are going to turn around the nine, as
20  opposed to the nine turning around the three?  Or worse
21  case, it's deadlock.

22          MR. LEWIS:  It wasn't his right to waive.  And if
23  he was going to, if waiver was going to occur, it was the
24  defendant's right to waive that.  And it should have been,