## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**STEPHEN JOHN CASEY, SR.,**            )
                                        )
      **Petitioner,**           )
                                        )
**v.**                                  )          **Civil Action No. 04-11940-PBS**
                                        )
**STEVEN O'BRIEN,**                     )
                                        )
      **Respondent.**           )
_____)

### RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITION

The Respondent, Steven O'Brien, in his capacity as Superintendent of the North Central Correctional Institute at Gardner, Massachusetts (the "Respondent"), hereby submits this brief in opposition to the Habeas Corpus Petition (the "Petition") filed by Petitioner Steven John Casey, Sr. (the "Petitioner"). The Petition should be dismissed, the Petitioner has failed to satisfy the statutory requirement that he first exhaust state remedies, and the claims advanced in his Petition are legally unsustainable.

### BACKGROUND

### I.    The Petitioner's Underlying Convictions on Child Sexual Abuse Charges

On December 17, 1998, the Petitioner was indicted under the name "Steven Casey" by a Bristol County, Massachusetts, grand jury on the following charges: (1) violating M.G.L. c. 265, § 22A by raping a child under the age of sixteen years using force on divers dates and times between December 1, 1990 and August 31, 1998, in the City of New Bedford; and (2) violating M.G.L. c. 265, § 13B by indecently assaulting and battering a child under the age of fourteen years on divers dates and times between December 1, 1990 and August 31, 1998, in New

Bedford.  (First Bristol Docket; Bristol Rape Indictment; Bristol Indecent A&B Indictment.)

The victim named in each indictment was his nephew ("A.V." or the "victim").[1]  See

Commonwealth v. Casey, 442 Mass. 1, 3, 809 N.E.2d 980, 982 (2004).  At his arraignment that

same day, he pled not guilty on all charges.  (First Bristol Docket.)

The Petitioner was tried in the Bristol County Superior Court (the "Bristol Court") before

the Honorable Richard J. Chin and a jury between October 14 and 20, 1999.  (Id.; Tr. Bristol

Trial vols. I-IV.)  After the jury retired to the jury room, the following events occurred:

> After approximately [two hours and forty minutes of] deliberations, the
> jury reported that they were deadlocked at nine to three in favor of
> acquittal.  The judge instructed the jury conformably with Commonwealth
> v. Rodriquez, 364 Mass. 87, 98-99, 300 N.E.2d 192 (1973).  The jury
> continued to deliberate for approximately one hour before deliberations
> were suspended for the day.
>
> The following morning, a court officer informed the judge that the sole
> alternate juror had accompanied the jury into the jury room at the very
> beginning of deliberations the previous day.  The judge commented that
> "[i]t probably is grounds for a mistrial," but sought the views of counsel.
> The defendant's attorney said:  "Even though it may be grounds for a
> mistrial and if the court would entertain, I'd reserve on that question.
> We've got a jury out."  On the prosecutor's suggestion the judge inquired
> of the alternate juror.  The brief questioning revealed that the alternate
> juror "walked in for maybe two minutes" after deliberations had begun,
> asked a question, and then left the jury room.  The judge did not ask the
> alternate juror what he had asked, but concluded that the alternate juror
> had not "participated in any meaningful way in deliberations."  The jury
> deliberated for approximately two hours and forty minutes on that second
> day of deliberations before returning guilty verdicts on both charges.

Casey, 442 Mass. at 3-4, 809 N.E.2d at 982-83.[2]

---

[1] The Petitioner was also indicted on the same day for violating M.G.L. c. 265, § 24B by
assaulting a child under the age of sixteen years with intent to rape on divers dates and times
between January 1, 1985 and August 10, 1988, in New Bedford.  (First Bristol Docket; Bristol
Assault with Intent to Rape Indictment.)  He was not tried on this charge at his Bristol County
trial, and it was nolle prossed on December 30, 1999.  (Id.)

Also relevant to the instant case are other events occurring during the Petitioner's Bristol

County trial. Specifically:

> [According to an affidavit of trial counsel,] on the second day of jury
> deliberations, [at the beginning of the last day of trial,] in open court, the
> victim was within five feet of the jurors and "gesturing and smiling at the
> jurors [as if] enticing the jury to find [the defendant] guilty." Nothing in
> the record suggests that the victim said anything to the jurors at the time.
> After the jury resumed deliberations, defense counsel objected to the
> victim's conduct and requested that the judge direct the victim to move
> away from the jury in the event that the jury returned to the court room for
> any reason other than to render a verdict. At that time the judge informed
> the parties that he had been notified by a court officer that the victim had
> also made a comment to the alternate juror in the hallway . . . after the
> alternate juror had been segregated from the jury.

Id. at 7-8, 809 N.E.2d at 985 (third and fourth alterations in original). The judge admonished the

victim, telling him that his conduct was inappropriate and he should have no further contact with

jurors or alternates. Id.

On October 20, 1999, the jury found the Petitioner guilty of rape of a child, which is a

lesser included offense of rape of a child with force and is punishable under M.G.L. c. 265, § 23,

and guilty of indecent assault and battery. (First Bristol Docket.) He was sentenced to serve

between four and six years in the Massachusetts State Prison on the rape charge, followed by

five years on probation on the indecent assault and battery charge. (Id.) He was also ordered to

pay $60 to the Victim Witness Assistance Fund and a $45 per month probation fee. (Id.)

The Petitioner was also indicted under the name "Steven J. Casey" by a Plymouth County

grand jury on October 16, 1998 on the following charges: (1) violating M.G.L. c. 265, § 23 by

raping a child under the age of sixteen years in or between January 1991 and September 1998, in

---

[2] Pursuant to 28 U.S.C. § 2254(e)(1), these and other factual determinations by state courts must
"be presumed to be correct. The applicant shall have the burden of rebutting the presumption of
correctness by clear and convincing evidence."

the Town of Rochester; (2) violating M.G.L. c. 265, § 13B by indecently assaulting and battering

a child under the age of fourteen years in or between January 1991 and June 10, 1998, in

Rochester; (3) violating M.G.L. c. 265, § 13B by indecently assaulting and battering a child

under the age of fourteen years in or between January 1996 and September 1998, in Rochester;

and (4) violating M.G.L. c. 265, § 13H by indecently assaulting and battering a person who has

attained the age of fourteen on or between June 11, 1998 and September 1998, in Rochester.

(First Plymouth Docket; Plymouth Rape Indictment; First Plymouth Indecent A&B on Child

Indictment; Second Plymouth Indecent A&B on Child Indictment; Plymouth Indecent A&B on

Person over 14 Indictment.)  Certain of these indictments named A.V. as the victim, while at

least one named the victim's brother ("N.V.") as the victim.  (Tr. Plymouth 2/25/00 Hr'g.)  The

Petitioner initially pled not guilty to these charges at his November 20, 1998 arraignment.  (First

Plymouth Docket.)  On February 25, 2000, though, the Petitioner tendered a plea of guilty on all

charges in a proceeding before Judge Chin in the Plymouth County Superior Court (the

"Plymouth Court").  (Id.)  Judge Chin accepted his plea after the Petitioner signed a waiver of his

rights and the Judge engaged in a colloquy with the Petitioner concerning his rights, the factual

allegations upon which the indictments were based, and the fact that he could be subject to

commitment as a sexually dangerous person.  (Id.; Plymouth Waiver of Rights; Tr. Plymouth

2/25/00 Hr'g at 4-12, 20.)  On the conviction for rape of a child, he was sentenced to a term of

between four and six years at the Massachusetts Correctional Institution at Cedar Junction, to be

served concurrently with the sentence that he was then serving as a result of his Bristol

conviction.  (First Plymouth Docket; Tr. Plymouth 2/25/00 Hr'g.)  On the other convictions, he

was sentenced to serve five years on probation.  (Tr. Plymouth 2/25/00 Hr'g.)  He was also given

credit for 70 days of time already served and was ordered to pay a $60 victim-witness fee.  (First Plymouth Docket.)

## II.    The Petitioner's State Court Challenges to His Convictions

On October 25, 1999, the Petitioner filed a Notice of Appeal to the Appellate Division of the Superior Court for a review of the sentence imposed in the Bristol case.  (First Bristol Docket.)  He also filed a Notice of Appeal on November 10, 1999 in which he stated that he was "appeal[ing] the finding of the Bristol County Superior Court on October 13, 1999, wherein he was convicted before Hurd, J."  (Bristol Notice of Appeal; see also First Bristol Docket.)  On or about July 13, 2000, he withdrew his petition for a review of his sentence.  (First Bristol Docket.)  In connection with his Plymouth conviction, he filed a motion for free transcripts on August 25, 2000, which was denied on August 29, 2000.  (First Plymouth Docket.)

It was not until 2002 that the Petitioner took additional steps in furtherance of state review of his convictions.  Specifically, on March 25, 2002, he filed a motion in the Bristol Court to compel production of his trial transcripts, which was allowed the next day.  (First Bristol Docket; Second Bristol Docket.)  He also filed a motion to reconsider his motion for free transcripts in the Plymouth Court on April 30, 2002, which motion was allowed on May 8 of that year.  (First Plymouth Docket.)

The Petitioner's appeal of his Bristol conviction was entered on the docket of the Massachusetts Appeals Court (the "Appeals Court") on June 19, 2002, but the Petitioner secured multiple stays of the proceedings as he pursued a motion to correct the record and a motion for a new trial in the Bristol Court.  (Appeals Ct. Docket No. 2002-P-0913.)  His Motion for a New Trial was filed in the Bristol Court on April 18, 2003.  (Second Bristol Docket.)  In that motion, he argued that his conviction should be set aside as a result of the alternate juror's brief presence

in the jury room, the victim's antics before the jury, and the fact that he allegedly failed to receive the effective assistance of counsel. <u>Casey</u>, 442 Mass. at 2, 809 N.E.2d at 982. That same day, the Petitioner filed a motion to withdraw his guilty plea and request for an evidentiary hearing in the Plymouth case. (First Plymouth Docket.) On July 22, 2003, Judge Chin issued a Memorandum of Decision and Order in which he allowed the Petitioner's motion for a new trial in the Bristol case based solely on the presence of the alternate in the jury room, but denied his motion to withdraw his guilty plea in the Plymouth case. (Second Bristol Docket; First Plymouth Docket; Second Plymouth Docket.) <u>See also</u> <u>Casey</u>, 442 Mass. at 2, 809 N.E.2d at 982. The Petitioner filed a Notice of Appeal on July 25, 2003 in connection with the decision in the Plymouth case. (First Plymouth Docket; Second Plymouth Docket.) In the Bristol case, the Commonwealth filed a Notice of Appeal on August 5, 2003 concerning the allowance of the new trial motion, while the Petitioner filed a Notice of Appeal on August 7, 2003 concerning the issues raised in his new trial motion but not addressed in Judge Chin's Order. (Second Bristol Docket.) The Commonwealth also filed a motion to reconsider the decision in the Bristol case on August 14, 2003, which motion was denied on August 21, 2003. (<u>Id.</u>) <u>See also</u> <u>Casey</u>, 442 Mass. at 2-3, 809 N.E.2d at 982.

Proceedings thus resumed in the Appeals Court concerning the Commonwealth's appeal of the allowance of the new trial motion and the denial of its motion to reconsider in the Bristol case, and the Petitioner's cross-appeal advancing those arguments raised in his new trial motion but not addressed in Judge Chin's decision. <u>See</u> <u>Casey</u>, 442 Mass. at 2-3, 809 N.E.2d at 982. In particular, the Petitioner contended as follows:

> (1) the victim engaged in conduct during trial that improperly influenced the jury, and counsel was ineffective for failing to address adequately that conduct; (2) the weight of the evidence does not support a conviction because the victim had a motive to accuse the defendant falsely and gave

> inconsistent accounts; and (3) defense counsel's failure to investigate
> whether the victim suffered from a bipolar mental disorder amounted to
> ineffective assistance of counsel.

Id. at 3, 809 N.E.2d at 982.[3]

The Petitioner's appeal of the denial of his motion to withdraw his guilty plea in the

Plymouth case was entered on the docket of the Appeals Court on August 1, 2003. (Appeals Ct.

Docket No. 2003-P-1027.) The Appeals Court denied a motion by the Petitioner to consolidate

the appeals in the Bristol and Plymouth cases because the appeals arose from different counties,

but the court did order that the two appeals would be heard by the same panel. (Id.; Appeals Ct.

Order; Appeals Ct. Docket No. 2002-P-0913; First Plymouth Docket; Second Plymouth Docket.)

On or about January 23, 2004, the appeal in the Bristol case was transferred to the

Supreme Judicial Court of Massachusetts (the "SJC") on its own motion. (SJC Docket No. SJC-

09187; Appeals Ct. Docket No. 2002-P-0913.) On February 4, 2004, the Petitioner filed an

application for direct appellate review by the SJC of the decision in the Plymouth case, upon

obtaining leave to file the same out of time. (SJC Docket No. DAR-13946.) His application was

allowed on February 23, 2004. (Id.) The appeals in the two cases were argued together before

the SJC. (SJC Docket No. SJC-09187; SJC Docket No. SJC-09212.) In a June 3, 2004 decision,

the SJC vacated the order allowing a new trial and reinstated the Petitioner's convictions in the

Bristol case. (SJC Docket No. SJC-09187.) Casey, 442 Mass. at 3, 809 N.E.2d at 982. On the

same date, the SJC affirmed the order denying the Petitioner's motion to withdraw his guilty plea

in the Plymouth case. (SJC Docket No. SJC-09212.)

---

[3] Reportedly, the victim's half-brother was removed from the family household as a result of
"allegations" that the victim's father (the half-brother's step-father) "did something" to the half-
brother. (Tr. Bristol Trial at II: 186-87, 198, 203 (testimony of victim's and half-brother's
mother).) The Petitioner has maintained that the victim fabricated his allegations of sexual abuse

### III.    The Instant Habeas Case

On September 13, 2004, the Petitioner filed the Petition at issue, which listed his Bristol conviction as the judgment under attack.  (Petition ¶ 1 (listing New Bedford Superior Court as court that entered judgment of conviction under attack).)  At the time of its filing, he was an inmate at the North Central Correctional Institute at Gardner, Massachusetts.  (Petition.)  The Petition advanced the following claims:  (1) that the Petitioner was denied the effective assistance of counsel, because his counsel could not plan for the victim to change his story and perjure himself on the witness stand; (2) that the Commonwealth unlawfully induced him to plead guilty in the Plymouth case; (3) that his conviction in the Plymouth case amounted to constitutionally impermissible double jeopardy; (4) that the SJC "[s]haded facts in [their] ruling to imply truths that were not in the record"; and (5) that he has been punished pursuant to an unconstitutional ex post facto law.[4]  (Petition ¶ 12.)

Pursuant to this Court's Briefing Order of December 30, 2004, the Petitioner filed a Brief in support of his Petition (his "Habeas Brief") on January 31, 2005.  Therein he elaborated on each of the claims in his Petition, and also referenced his belief that the victim's antics in the jury's presence "did amount to an unwarranted intrusion constituting an extraneous influence on the jury."  (Pet'r's Br. Supp. Petition)  Additionally, the Petitioner indicated that it was his "intent for this [C]ourt to read and include into, as part of the Petitioner's brief" his brief to the Appeals Court and SJC (his "State Appellate Brief").  (Pet'r's Br. Supp. Petition table of

---

against the Petitioner in order to bring his half-brother home by clearing his father of suspicion. (Pet'r's Br. to Appeals Ct./SJC at 33-34.)

[4] This ex post facto claim also refers to an "ineffective assistance of counsel," though the Petitioner fails to explain the relevance of such words in this context.  (Petition ¶ 12.D.)

contents; see also id. at 12 ("The Petitioner prays this Honorable Court will allow the Petitioner's [State Appellate Brief] to become a direct part of this brief . . . .").)

## ARGUMENT

### I.    The Petitioner's attempt to expand the scope of his action through his Habeas Brief is procedurally improper.

The Petitioner has improperly attempted to expand the scope of his action through his Habeas Brief. A habeas corpus petitioner is required by statute and rule to set forth the facts supporting all his claims for relief within his petition. Specifically, 28 U.S.C. § 2242 provides that a petition "shall allege the facts concerning the applicant's commitment or detention." 28 U.S.C. § 2242. This provision requires a petitioner to "state facts upon which his claim to relief is predicated," a requirement of which a petitioner should not be relieved, even where his petition is "read with a measure of tolerance" because it was filed pro se. Wade v. Yeager, 377 F.2d 841, 846 (3d Cir. 1967). Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts (the "Habeas Corpus Rules") elaborates on this requirement by setting forth that a "petition must [inter alia]: (1) specify *all the grounds for relief* available to the petitioner; (2) state the facts supporting *each ground*; [and] (3) state the relief requested." Habeas Corpus Rule 2(c) (emphasis added).

Where a petitioner wishes to amend his petition, he should follow the procedures for amendment set forth in the Federal Rules of Civil Procedure. Title 28, Section 2242 of the U.S. Code provides that a petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. Likewise, Habeas Corpus Rule 11 sets forth that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules." Habeas Corpus Rule 11. Thus, "[w]hen [the Habeas Corpus Rules] are otherwise silent, Rule 11

compels [the court] . . . to follow the Federal Rules of Civil Procedure in disposing of habeas

corpus petitions."  McDonnell v. Estelle, 666 F.2d 246, 249 (5th Cir. 1982).

Amendments to pleadings are governed by Federal Rule of Civil Procedure 15, which

provides as follows:

> A party may amend the party's pleading once as a matter of course at any
> time before a responsive pleading is served or, if the pleading is one to
> which no responsive pleading is permitted and the action has not been
> placed on the trial calendar, the party may so amend it at any time within
> 20 days after it is served.  Otherwise a party may amend the party's
> pleading only by leave of court or by written consent of the adverse party;
> and leave shall be freely given when justice so requires.

Fed. R. Civ. P. 15(a).  A petitioner's compliance with this rule is important, because a formal

amendment makes clear for the respondent and the court the exact scope and nature of his

claims.

Contrary to the provisions cited above, the Petitioner never formally amended his Petition

to clarify exactly what claims he is asserting.  Instead, he listed certain claims in his Petition, and

then signaled a desire to supplement that list by vaguely stating in his Habeas Brief that it was

his "intent for this [C]ourt to read and include into, as part of the Petitioner's brief" his State

Appellate Brief.  (Pet'r's Mem. Supp. Petition table of contents; see also id. at 12 ("The

Petitioner prays this Honorable Court will allow the Petitioner's [State Appellate Brief] to

become a direct part of this brief . . . .")).  Thus, by merely inserting an ambiguous phrase into

his brief, rather than formally amending his Petition, he attempts to substantially expand the

scope of his action and has created confusion about exactly what that scope entails.  This attempt

should not be permitted.  Cf. Cognitest Corp. v. Riverside Publ'g Co., 107 F.3d 493, 499 n.5

(1997) (finding that plaintiff waived issue of its right to amend pleading as a matter of course

prior to service of responsive pleading, because it "did not invoke that right before the district

court, nor did it do so [before the Court of Appeals] in its opening brief"); <u>Sansom Co. v. Lynn</u>, 366 F. Supp. 1271, 1278 (E.D. Pa. 1973) ("The proper means of raising claims that have inadvertently not been raised in the complaint is an amended complaint, not a brief in opposition to a motion to dismiss."); <u>M.S. Chambliss v. Coca-Cola Bottling Corp.</u>, 274 F. Supp. 401, 409 (E.D. Tenn. 1967) (stating, in response to plaintiff's assertion in brief that he "would 'like to treat the Amended Complaint' as containing certain additional language," that "[e]ven under liberal federal rules of pleading, the practice of amending by brief seems inappropriate"), <u>aff'd</u> 414 F.2d 256 (6th Cir. 1969).

## II.    **The Petitioner failed to satisfy the statutory requirement that he exhaust state remedies prior to filing his Petition.**

In addition to the foregoing, the Petitioner is barred from pursuing this action because he failed to satisfy the statutory requirement that he exhaust state remedies prior to filing his Petition.  This exhaustion requirement is codified at 28 U.S.C. § 2254, which provides in relevant part as follows:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –

> (A) the applicant has exhausted the remedies available in the courts of the State;  or

> (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>  . . .

> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), P.L. No. 104-132, Title I, § 104, 110 Stat. 1218 (effective April 24, 1996).

      The exhaustion requirement is primarily designed to promote comity in our system of

federalism, as the U.S. Supreme Court has explained:

> The exhaustion doctrine is principally designed to protect the state court's
> role in the enforcement of federal law and prevent disruption of state
> judicial proceedings. . . .  Because "it would be unseemly in our dual
> system of government for a federal district court to upset a state court
> conviction without an opportunity to the state courts to correct a
> constitutional violation," federal courts apply the doctrine of comity,
> which "teaches that one court should defer action on causes properly
> within its jurisdiction until the courts of another sovereignty with
> concurrent powers, and already cognizant of the litigation, have had an
> opportunity to pass upon the matter."

Rose v. Lundy, 455 U.S. 509, 518 (1982) (quoting Darr v. Burford, 339 U.S. 200, 204 (1950),

overruled in non-relevant part by Fay v. Noia, 372 U.S. 391 (1963)); see also Duckworth v.

Serrano, 454 U.S. 1, 3 (1981) ("The exhaustion requirement . . . serves to minimize friction

between our federal and state systems of justice by allowing the State an initial opportunity to

pass upon and correct alleged violations of prisoners' federal rights."); Nadworny v. Fair, 872

F.2d 1093, 1096 (1st Cir. 1989) (explaining that exhaustion requirement embodies "the federal

sovereign's respect for the state courts' capability to adjudicate federal rights"); Mele v.

Fitchburg Dist. Court, 850 F.2d 817, 819 (1st Cir. 1988) (noting that exhaustion requirement

"ensures that state courts have the first opportunity to correct their own constitutional errors,"

enables federal courts to accord appropriate respect for state sovereignty, and promotes comity

by minimizing friction between federal and state justice systems).  An additional benefit of the

requirement is that "claims that have been fully exhausted in state courts will more often be

accompanied by a complete factual record to aid the federal courts in their review."  Rose, 455

U.S. at 519.

In light of these important purposes, a petitioner will not be found to have satisfied the exhaustion requirement unless each and every claim in his petition has been exhausted.  See id. at 510, 518-20.  This rule is designed to encourage petitioners to exhaust all claims and present the federal court with a single petition, rather than piecemeal litigation.  Id. at 520.  It also "relieve[s] the district courts of the difficult if not impossible task of deciding when claims are related," and it reduces the risk that they will consider unexhausted claims.  Id. at 519.

A claim will only be found exhausted if both its factual and legal bases have been presented to state courts.  See Nadworny, 872 F.2d at 1096 (stating that state prisoner must present both factual and legal underpinnings of claim to state courts for exhaustion requirement to be found satisfied); see also Adelson v. DiPaola, 131 F.3d 259, 262 (1st Cir. 1997) (noting that "setting forth the factual underpinnings of a claim is insufficient, in and of itself," as the "petitioner must also elucidate the legal foundation of his federal claim").  Moreover, it is not sufficient for a petitioner to raise his claim merely through a motion in state trial court or even an appeal to an intermediate court.   Rather, he must "present, or do his best to present, his federal claim to the state's highest tribunal."  Adelson, 131 F.3d at 263; see also Mele, 850 F.2d at 819-20 (stating that it has long been the rule that power of highest state court must be exhausted before federal court will consider questions posed in habeas petition, and Massachusetts petitioner was thus obliged to try to bring his constitutional objections before SJC in order to preserve them for federal habeas review).  Thus, "a habeas petitioner bears a heavy burden" to show that his claims were "fairly and recognizably presented to the state courts."  Adelson, 131 F.3d at 262.

The Petitioner here has not met this burden.  Not one of the claims included in his initial Petition was presented to the SJC in any fashion.  (Pet'r's Br. to Appeals Ct./SJC.)  See also

Casey, 442 Mass. at 3, 809 N.E.2d at 982 (listing issues presented on appeal).  Moreover, not all

of those claims that he did present to the SJC were based on grounds of federal law, as discussed

infra Section IV.  Thus, even if this Court allows the Petition to be expanded in the manner

desired by the Petitioner, see supra Section I, it would at best constitute a "mixed petition" of

both exhausted and unexhausted claims that still runs afoul of the exhaustion requirement.  See

Rose, 455 U.S. at 510, 518-20 (holding "that a district court must dismiss habeas petitions

containing both unexhausted and exhausted claims," and commenting that "[j]ust as pro se

petitioners have managed to use the federal habeas machinery, so too should they be able to

master this straightforward exhaustion requirement").

The Petitioner's failure to exhaust was not excused by application of any statutory

alternative to exhaustion.  As in Mele, the Petitioner has not argued and cannot argue that there is

an absence of state collateral procedures available to permit him to raise his federal claims.  850

F.2d at 824 (stating that court was unaware of any lack of available procedures in Massachusetts,

and noting that "Massachusetts provides a broad panoply of procedures for post-conviction

challenges to the validity of criminal sentences").  He also cannot maintain that any such

assertion of federal claims in state court would be futile, and "it would be presumptuous . . . to

conclude that [the Petitioner] is barred from seeking such relief when he has never endeavored to

pursue it."  Id.

In light of the Petitioner's complete failure to exhaust state remedies and inability to

invoke any statutory exception, dismissal of the Petition at issue is warranted.  See, e.g., Rose,

455 U.S. at 510 (affirming that statutory scheme requires dismissal of petition containing

nonexhausted claims); Duckworth, 454 U.S. at 4 ("Because obvious constitutional errors, no less

than obscure transgressions, are subject to the requirements of § 2254(b), the Court of Appeals was obligated to dismiss respondent's petition.").

**III.     The claims not presented to the SJC should be dismissed on the merits, notwithstanding the Petitioner's failure to exhaust.**

Notwithstanding the Petitioner's failure to satisfy the statutory exhaustion requirement, all of the Petitioner's claims that were not presented to the SJC should be dismissed. Dismissal at this stage is fully consonant with this Court's authority under 28 U.S.C. § 2254. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") The Court's exercise of such authority here would be warranted, because each of these claims is unsustainable. Cf. Fed. R. Civ. P. 12(b)(6) (authorizing motion to dismiss for "failure to state a claim upon which relief can be granted"), made applicable by Habeas Corpus Rule 11 ("The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied, when appropriate, to petitions filed under these rules.").

**A.     The Petitioner was not denied the effective assistance of counsel as a result of alleged inconsistencies in the victim's testimony.**

The Petitioner cannot maintain an ineffective assistance of counsel claim based on the grounds stated in his initial Petition. Those grounds were that the "State's main witness made statements under oath at [the] probable cause hearing, then denied making said statements at trial. My defense was not able to be planned whereas story was changed and witness allowed to perjure his testimony." (Petition ¶ 12.A.) In other words, the Petitioner argues that the victim surprised defense counsel by providing trial testimony that was inconsistent with his prior statements and thus prevented defense counsel from providing effective legal assistance.

This does not state a claim for ineffective assistance of counsel.  It is recognized that a criminal defendant may be deprived of the Sixth Amendment right to the effective assistance of counsel based on a complete deprivation of legal assistance, based on interference by the government, or based on the conduct or interests of his counsel.  Strickland v. Washington, 466 U.S. 668, 683, 686, 692 (1984) (referencing situations where a criminal defendant was "actual[ly] or constructive[ly] deni[ed] . . . the assistance of counsel altogether," where the government "interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense," where "counsel's assistance was rendered ineffective by a conflict of interest," or where "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.").  The Respondent is aware of no case suggesting that a deprivation of such right may be based merely on the conduct of a witness on the stand.

To the extent that his Petition can be read as alleging that he received ineffective assistance because of his counsel's conduct, he still could not prevail.  As discussed in greater depth infra Section IV.D, an ineffective assistance claim of this type requires a defendant to show first "that counsel's performance was deficient," and second "that the deficient performance prejudiced the defense."  Strickland, 466 U.S. at 687.  Whether counsel's performance was deficient is evaluated based on the information available to counsel at the time, not based on hindsight:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id. at 689 (citation omitted).  At the relevant time, defense counsel could not have known exactly how the victim would respond to each question posed.  Indeed, the Petitioner himself alleges not that his counsel failed to plan, but that he was "not *able to be* planned" as a result of the witness' surprise testimony.  (Petition ¶ 12.A.)  An attorney's performance is not deficient because he has failed to do that which cannot be done.  See United States v. Cronic, 466 U.S. 648, 657 n.19 (1984) ("Of course, the Sixth Amendment does not require that counsel do what is impossible . . . .").

In other words, the Petitioner was entitled to a "reasonably effective" attorney, not a soothsayer.  Id. at 688-69.  An ineffective assistance claim will not lie based on "an inaccurate prediction about sentencing," Knight v. United States, 37 F.3d 769, 775 (1st Cir. 1994), or an inability to "'divine the judicial development' of the law," Clark v. Moran, 942 F.2d 24, 33 (1st Cir. 1991) (quoting Elledge v. Dugger, 823 F.2d 1439, 1443 (11th Cir.1987)).  It certainly cannot lie based on an attorney's failure to foresee every change in a given individual's story.

This particular ineffective assistance claim is even further undercut by the fact that the Petitioner's counsel apparently *did* foresee and prepare for the victim's provision of testimony that was inconsistent with his prior statements.  Indeed, he impeached the victim accordingly. Specifically, he cross-examined A.V. concerning his testimony that the abuse began when he was six by asking about his alleged prior statements that the abuse began when he was nine, one, and three.  (Tr. Bristol Trial at II: 121-24, 139-41, 146-47.)  He also probed the witness about whether he accused the Petitioner of sexual abuse as a way of helping to bring home his half-brother.  (Id. at II: 124-31, 150-61, 174-76.)[5]  Additionally, defense counsel asked questions

---

[5] See supra note 3.

about the details of exactly how, when, where, and how many times he was abused, and what was said between him and the Petitioner on those occasions, in an apparent effort to call attention to inconsistencies and holes in the victim's account.  (Id. at II: 131-39, 141-50, 161-66.)  Thus, even if the Petition could be read as claiming that defense counsel's level of familiarity with the victim's prior accounts and preparedness for trial were deficient, the Petitioner still could not satisfy the first component of the Strickland test.

Likewise, the Petitioner also could not satisfy the prejudice component.  That is, he could not show any adverse impact upon the defense, given that his defense counsel did in fact highlight the inconsistencies in the victim's testimony for the jury.  Furthermore, any evaluation of whether the outcome could have been different must take into account the fact that, despite the victim's alleged lack of consistency concerning certain details, he *was* consistent in maintaining before the jury that he was sexually abused by the Petitioner.  (Id. at II: 77-176.)  Strickland's prejudice component, like its deficient performance component, cannot be satisfied here.

**B.    The Petitioner may not challenge his Plymouth conviction in the same Petition in which he challenges his Bristol conviction.**

The Petitioner's challenge to his plea in the Plymouth case is improper, because convictions in multiple state courts may not be challenged within the same petition.  The Habeas Corpus Rules in effect when the Petition was filed were clear:

> A petition shall be limited to the assertion of a claim for relief against the judgment or judgments of a single state court (sitting in a county or other appropriate political subdivision).  If a petitioner desires to attack the validity of the judgments of two or more state courts under which he is in custody or may be subject to future custody, as the case may be, he shall do so by separate petitions.

Habeas Corpus Rule 2(d) & 1976 advisory comm. notes (effective through Nov. 2004) (making clear that a "single state court" denotes "a court of the same county or judicial district or

circuit"); see also Thompson v. Missouri Bd. of Probation & Parole, 39 F.3d 186, 189 (8th Cir.

1994) (indicating that, based on its "plain language," Habeas Corpus Rule 2 "clearly [did] not

allow" petitioner to challenge convictions in two different counties within one § 2254 petition);

cf. Habeas Corpus Rule 2(e) (effective Dec. 1, 2004) ("A petitioner who seeks relief from

judgments of more than one state court must file a separate petition covering the judgment or

judgments of each court.").

The Petitioner has not complied with this rule.  His Petition lists the "New Bedford

Superior Court" as the "court which entered the judgment of conviction under attack" (Petition ¶

1), and both his Petition and Habeas Brief generally discuss his jury trial and conviction in that

Bristol County court (see generally Petition; Pet'r's Br Supp. Petition.).  Nevertheless, the

second claim set forth in his Petition is that he was unlawfully induced to plead guilty in the

Plymouth Court.  (Petition ¶ 12.B.)  His attack on the judgment resulting from that plea should

not be entertained here.

Even if the Petitioner were permitted to advance such a claim, it should be dismissed.  At

best, the claim could be read as contending that his guilty plea was not "'voluntary' . . . and

made 'knowing[ly], intelligent[ly], [and] with sufficient awareness of the relevant circumstances

and likely consequences,'" e.g., United States v. Ruiz, 536 U.S. 622, 628-29 (2002) (quoting

Brady v. United States, 397 U.S. 742, 748 (1970)), because the Petitioner believed the victim had

"perjured himself" in the Bristol County trial and could be expected to do so again.  (Petition ¶

12.B.)  Such a claim would be belied by the Petitioner's signed Waiver of Rights form and the

transcript of his plea colloquy in the Plymouth Court, which establish the knowing, intelligent,

and voluntary nature of his plea, as well as his understanding of the substance of the charges and

the rights he was waiving.  (Plymouth Waiver of Rights; Tr. Plymouth 2/25/00 Hr'g at 4-12.)

19

Additionally, it would amount to no more than an attack on the victim's truthfulness, which must not be entertained in this habeas proceeding, as discussed infra Section IV.C.

C.    **The Petitioner's double jeopardy claim is entirely meritless, because the Fifth Amendment does not bar multiple prosecutions arising from multiple violations of the same statute.**

The Petitioner's double jeopardy argument is characterized by a complete misunderstanding of the intent and scope of the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution.  The Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. am. V.  Made applicable to the States through the U.S. Constitution's Fourteenth Amendment, it "'protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense.'"  E.g., Brown v. Ohio, 432 U.S. 161, 165 (1977) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled in part on other grounds, Alabama v. Smith, 490 U.S. 794 (1989)).  The Petitioner's argument appears to be based on the erroneous belief that the term "offence" as used in the Clause means "statutory violation."  He thus reasons that, once he was convicted for certain acts of rape committed in one county, he could not be subsequently convicted for other acts of rape committed in another county against the same victim.  Common sense, of course, dictates that he cannot be correct.  If he were, he would now have license to commit such acts upon his nephew without any fear of criminal consequences.

His reasoning is also squarely at odds with case law.  See, e.g., Blockburger v. United States, 284 U.S. 299, 301-03 (1932); cf. Brown v. Ohio, 432 U.S. 161, 169-70 & n.8 (1977) (distinguishing constitutionally offensive practice of "dividing a single crime into a series of temporal or spatial units" to impose multiple punishments, from constitutionally permissible

practice of punishing multiple parts of course of conduct separately where each part constitutes a separate crime under state law).  The petitioner in Blockburger argued that two sales of the same drug to the same person in violation of the same statute, but occurring one day apart from one another, constituted one offense and thus should not have given rise to guilty verdicts on two separate counts.  284 U.S. at 301.  The High Court disagreed, reasoning that once "the first sale had been consummated, . . . the payment for the additional drug, however closely following, was the initiation of a separate and distinct sale completed by its delivery," notwithstanding the fact that the two sales were "made to the same person."  Id.  The Court made clear that resolution of such issues depends largely on the terms of the statutes at issue.  It cited the explanation in Wharton's Criminal Law that "'[t]he test is whether the individual acts are prohibited, or the course of action which they constitute.  If the former, then each act is punishable separately . . . If the latter, there can be but one penalty.'"  Id. (quoting Wharton's Criminal Law § 34 (11th ed.), and finding significance in fact that the statute at issue did "not create the offense of engaging in the business of selling the forbidden drugs, but penalize[d] any sale made in the absence of either of the qualifying requirements set forth.  Each of several successive sales constitutes a distinct offense, however closely related they may follow each other.").

The Blockburger Court thus found the situation before it distinguishable from that in In re Snow, where the offense of "cohabiting with more than one woman" was determined to be "'inherently, a continuous offense, having duration; and not an offense consisting of an isolated act.'"  Id. at 302 (quoting In re Snow, 120 U.S. 274, 281 (1887)).  The case at bar, the Court concluded, was more analogous to cases such as Ebeling v. Morgan, in which the accused was found to have committed a separate violation of the applicable statute with each and every act of cutting open a mailbag with intent to rob.  Id. at 303 (citing Ebeling v. Morgan, 237 U.S. 625

(1915) ("Although the transaction of cutting the mail bags was in a sense continuous, the complete statutory offense was committed every time a mail bag was cut in the manner described, with the intent charged . . . , irrespective of any attack upon, or mutilation of, any other bag.")).

Consistent with this reasoning, numerous federal courts have found that multiple sex acts perpetrated upon a single victim, even when very close in time and place, may be punished as separate and distinct crimes without violating the Double Jeopardy Clause.  See, e.g., Baker v. Gearinger, 293 F.3d 1353, 1354 (11th Cir. 2002) (concluding that habeas petitioner's conviction on multiple child molestation charges allegedly arising "out of a single episode lasting only a few minutes" was not contrary to and did not involve unreasonable application of established federal double jeopardy law, where state statute punished any act of molestation, and petitioner performed three such acts, each of which "could independently constitute an immoral act done for his arousal . . . [and] was the result of an independent choice by [him,] . . . and none "was the necessary cause or consequence of any of the others"); Rhoden v. Rowland, 10 F.3d 1457, 1461-62 (9th Cir. 1993) (rejecting habeas petitioner's claim that Double Jeopardy Clause was violated by his conviction for one charge arising from digital penetration and another arising from allegedly "incidental" act of intercourse, because under applicable state law "a defendant may receive multiple punishments for numerous sex offenses rapidly committed with the sole aim of sexual gratification," even if they are "'closely connected in time and a part of the same criminal venture so long as they are separate and distinct and one act is not committed as a means of committing another,'" and the evidence indicated that the acts were not "simultaneous" and the digital penetration was not "necessary or preparatory to the act of intercourse," making the crimes "distinct" (quoting People v. Reynolds, 154 Cal. App. 3d 796, 810, 201 Cal. Rptr. 826,

832 (Cal. 2d Dist. 1984))); <u>Bruce v. Duckworth</u>, 659 F.2d 776, 783-84 (7th Cir. 1981) (rejecting

habeas petitioner's claim that Double Jeopardy Clause was violated by his conviction and

sentencing for rape and armed rape arising from two acts of raping same woman on same day,

because "two separate acts of rape were committed by petitioner" and thus the "[p]etitioner

completed the crime of rape twice, not once. . . .  In addition, petitioner was given sufficient

notice, by way of his indictment, that he was being charged with two separate acts of rape");

<u>United States v. Taylor</u>, 562 F.2d 572, 574 (8th Cir. 1977) (rejecting direct appellant's argument

that he was impermissibly subjected to double jeopardy, where "[t]he indictment properly

charge[d] him with four distinct crimes arising out of two incidents" of raping same woman on

same day); <u>Krueger v. Coplan</u>, 238 F. Supp. 2d 391, 392, 394-95 (D.N.H. 2002) (rejecting

habeas petitioner's argument that state violated Double Jeopardy Clause "when it charged and

convicted him of ninety discrete criminal offenses arising from a single and continuous course of

sexual misconduct with a minor child [during] a twenty-five minute period . . . , each offense

based upon different, though temporally close, conduct," reasoning, in part based on

<u>Blockburger</u>, that acts could be charged separately because the state legislature defined them as

separate crimes, "each indictment rested upon separate and distinct factual predicates . . . [, and

m]aterial facts necessary to prove one offense charged were different from the material facts

necessary to prove each other charged offense," though also taking into account that the trial

judge "imposed a sentence within the range applicable to one offense of conviction").

      Here, there can be no doubt that the Petitioner's Bristol and Plymouth convictions arose

from separate and distinct incidents, and that such incidents could not be viewed as constituting

one "continuous" course of conduct.  The incidents were, in fact, not even as close to one another

in time and place as those involved in the cases cited above.  The Bristol indictments charged

him with committing acts of sexual abuse in New Bedford (Bristol Rape Indictment; Bristol

Indecent A&B Indictment), while the Plymouth indictments charged him with committing sexual

abuses in Rochester (Plymouth Rape Indictment; First Plymouth Indecent A&B on a Child

Indictment; Second Plymouth Indecent A&B on a Child Indictment; Plymouth Indecent A&B on

a Person over 14 Indictment).  As the prosecutor in the Bristol case explained in arguing a

motion in limine, "the complaining witness . . . would indicate that certain things were

happening to him, sexual acts perpetrated by the uncle, at a residence in New Bedford, 113

Reynolds Street.  At the same time  . . . the victim would indicate that the uncle would be taking

him to a place called Mary's Pond and similar acts were being perpetrated on him at that

location."  (Tr. Bristol Trial at I: 4-5.)[6]  The victim testified as anticipated.  He primarily

discussed a series of incidents occurring at the building in New Bedford where he and his uncle

both lived.  (Id. at II: 77, 81, 91-109, 111-12, 120-21, 133-49, 161-65.)  But he also indicated

that, after moving away, the Petitioner returned to take him and his siblings to Mary's Pond in

Rochester, where he committed the last act of sexual abuse that the victim could recall.  (Id. at II:

109-12.)  Furthermore, the Petitioner himself admitted to committing the abuse giving rise to the

Plymouth convictions at Mary's Pond.  (Tr. Plymouth 2/25/00 Hr'g at 8-11.)  Thus, the acts in

Bristol and the acts in Plymouth were each "the result of an independent choice by [him]."

Baker, 293 F.3d at 1354.  The acts, "although [committed upon] the same person, were distinct

---

[6] While the prosecutor at that time indicated that Mary's Pond was located in Lakeville,
testimony at trial made clear that Mary's Pond is in Rochester.  (Tr. Bristol Trial at II: 110
(testimony by A.V. that Mary's Pond is located in Rochester).)  This is consistent with publicly
available information.  See The Official Website of Rochester, Massachusetts:  Town
Information (visited Mar. 16, 2005) <http://www.townofrochestermass.com/info.htm> ("Mary's
Pond is among the town's most picturesque areas . . . .").

and separate [acts committed] at different times," as opposed to one "'continuous offense, having duration.'"  Blockburger, 284 U.S. at 301-02 (quoting Snow, 120 U.S. at 281).

In addition to the foregoing, the statutes under which he was convicted prohibited "'individual acts,'" not any "'course of action which they constitute.'"  Blockburger, 284 U.S. at 302 (quoting Wharton's Criminal Law § 34 (11th ed.)).  Chapter 265, Section 23 of the Massachusetts General Laws punishes not one who engages in a certain course of conduct, but one who "unlawfully has sexual intercourse or unnatural sexual intercourse, and abuses a child under sixteen years," and it provides for a higher minimum sentence "for the second or subsequent offense."  M.G.L. c. 265, § 23.  Similarly, Chapter 265, Section 13B punishes "an indecent assault and battery on a child under the age of fourteen" and sets forth a more severe sentence range for "a second or subsequent such offense."  M.G.L. c. 265, § 13B.

Based on the fact that he suffered multiple punishments for separate and distinct acts punishable as such under state law, the Petitioner cannot be found to have been "subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. am. V.

**D.    The Petitioner's criticism of language in the SJC's decision does not warrant a claim for habeas corpus relief.**

The next claim in the Petition – that the SJC "[s]haded facts in [its] ruling to imply truths that were not in the record" – is not a proper basis for a habeas corpus action.  (Petition ¶ 12.C)  A habeas petition challenging a state conviction may only be entertained "on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); see also 28 U.S.C. § 2241(c) (providing that writ of habeas corpus shall not extend to prisoner in custody for violation of state law unless "[h]e is in custody in violation of the Constitution or laws or treaties of the United States"); cf. Habeas Corpus Rule 2(d) (effective through Nov. 2004) ("A petition shall be limited to the assertion of a claim for relief against the

25

*judgment or judgments* of a single state court . . . ." (emphasis added)).  The claim at issue does not challenge the lawfulness of the Petitioner's confinement or conviction, but merely challenges the wording of the SJC's opinion.  (Petition ¶ 12.C.)  Indeed, the Petitioner does not allege that the SJC's findings of fact were inaccurate, only that its characterization of those facts in its opinion was unfair.  (Id.)  It is apparent that the Petitioner is simply taking advantage of the habeas corpus process available to prisoners in order to raise issues unrelated to the lawfulness of his conviction.

Even if the Petition could be read as contending that the SJC made "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," which may warrant habeas relief in appropriate circumstances, 28 U.S.C. § 2254(d)(2), the Petitioner could not prevail.  That is, he could not meet his statutory "burden of rebutting" by clear and convincing evidence the "presumption of correctness" that attaches to "a determination of a factual issue made by a State court."  Id. § 2254(e)(1); see also, e.g., Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002) (noting that "[u]nless the petitioner can carry this heavy burden, a federal habeas court must credit the state court's findings of fact – and that remains true when those findings are made by a state appellate court as well as when they are made by a state trial court"); Mastracchio v. Vose, 274 F.3d 590, 598 (1st Cir. 2001) (noting that § 2254(d)(2) must be interpreted in light of § 2254(e)(1), and that "[a] habeas petitioner therefore must clear a high hurdle before a federal court will set aside any of the state court's factual findings").  The first reason for this conclusion is that the SJC did not make "an unreasonable determination of" or even "shade" the facts.  The Petitioner's charge of shading is predicated on three allegations.  The only allegation stated in the initial Petition reads as follows: "'Background' S.J.C. states 'victim testified that defendant began abusing him when (He) was

six years old,' They leave out victim's testimony under oath that (HE) states abuse began when (he) was nine, then when he was twelve . . . and stated that was the only time [sic]." (Petition ¶ 12.C.)  There was no shading, as the victim did in fact testify that the abuse upon him began when he was six.  (Tr. Bristol Trial at II:  92, 112, 121, 140-41.)  This statement is not made untrue by the fact that the victim may have offered a different age on other occasions.  The next allegation is that the SJC shaded the facts by noting the Petitioner's own assertions that the victim offered "inconsistent statements" and "conflicting stories," but did not describe the victim's conduct as perjury.  (Pet'r's Br. Supp. Petition at 11 (arguing that "the record meets the requirement for perjury under M.G.L.A., and can not be brushed off as mere 'inconsistent statements'" and that "it would seem this is sh[a]ding facts, when perjured testimony is refer[r]ed to as 'conflicting stories' or 'reflecting a lack of tru[t]hfulness'").)  This allegation is absurd, because the victim was not convicted of the crime of perjury; the SJC's use of the phrases "inconsistent statements," "conflicting stories," and "a lack of truthfulness" does in fact convey the message desired by the Petitioner; and the SJC used those particular words because *it was restating the Petitioner's own assertions*, and it did so accurately.  See Casey, 442 Mass. at 8, 809 N.E.2d 985 (quoting Petitioner's allegations regarding conflicting stories and lack of truthfulness).  (See also Pet'r's Br. to Appeals Ct./SJC at 33-36 (alleging that victim gave "inconsistent stories" and "conflicting stories," and displayed a "lack of truthfulness").)  The Petitioner's third allegation is that the SJC shaded the facts in stating that the victim's antics at trial "'could have been viewed as nothing more than innocuous childlike behavior . . . ."  (Pet'r's Br. Supp. Petition at 13.)  This cannot be viewed as a shading of the facts, because it does not even purport to be a recitation of the facts.  Rather, it is what the court believed was a possible interpretation of the facts – and it is a reasonable one.  Reportedly, the victim "'look[ed] and

act[ed] much younger than his actual age,'" and his conduct with respect to the jury involved no more than "'gesturing and smiling at the jurors.'"  Casey, 442 Mass. at 7, 809 N.E.2d at 985 (quoting defense counsel's affidavit).  Also, "[n]othing in the record suggest[ed] that the victim said anything to the jurors at the time."  Id.  This allegation of shading, like the others, is groundless.

The second reason that relief could not be afforded due to "an unreasonable determination of the facts" is that such relief is not authorized unless the factual determination at issue formed the basis for the state court's decision.  See 28 U.S.C. § 2254(d)(2) (providing for relief where state court decision "was *based on* an unreasonable determination of the facts . . ." (emphasis added)); cf. Wiggins v. Smith, 539 U.S. 510, 551-52 (2003) (Scalia, J., joined by Thomas, J., dissenting) (stating that state court decision must be "'based on' [a] mistaken factual determination" for § 2254(d)(2) to apply, and that "[t]he [Supreme Court's majority] opinion does not even discuss this requirement of § 2254(d)(2), that the unreasonable determination of facts be one on which the state-court decision was *based*" (emphasis in original)).  That is not the case here.  The SJC's decision was not based on any finding that the victim consistently testified that the abuse began when he was six, or on any finding that the alleged inconsistencies and conflicts in his accounts were trivial.  In fact, its opinion reflects that it gave due attention to the Petitioner's allegations regarding such inconsistencies.  Casey, 442 Mass. at 8-9, 809 N.E.2d at 985-86 (discussing Petitioner's challenge to evidence based on victim's alleged conflicting stories and motive to fabricate).  Ultimately, though, the SJC's decision concerning the weight of the evidence against the Petitioner was based on the legal principles that "credibility is an issue left for the jury to decide" and a witness is not unworthy of belief as a matter of law simply because he "may have a motive to lie and . . . gives inconsistent statements."  Id. at 8-9, 809

N.E.2d at 986.  The SJC's decision also was not based on any determination that the victim's

antics amounted to "innocuous childlike behavior."  The SJC only referred to the victim's antics

in that fashion in reasoning that trial counsel was not ineffective for failing to request an

admonishment of the victim in the jury's presence and an instruction to the jury because such a

request "could have been viewed as an overreaction by counsel to what was nothing more than

innocuous childlike behavior."  Id. at 8, 809 N.E.2d at 985.  In the end, its determination on the

question of ineffective assistance was based on the following grounds:  "[n]othing in the record

suggest[ed] that the victim said anything to the jurors at the time"; the judge's admonishment to

the victim outside the jury's presence "afforded the defendant all the relief he requested";

anything further may have been viewed by the jury as an overreaction by defense counsel; and

the victim's conduct "was sufficiently innocent" that it did not "constitute[] an extraneous

influence on the jury" and "likely did not prejudice the defendant's right to a fair trial."  Id. at 7-

8, 809 N.E.2d at 985.

Thus, the Petitioner's claim is improper and, even if read generously and considered by

this Court, is unsustainable under any theory.

**E.    The Commonwealth's application to the Petitioner of its amended protocols for handling sexually dangerous persons did not violate the Ex Post Facto Clause.**

Also erroneous is the Petitioner's contention that the Commonwealth violated the U.S.

Constitution's Ex Post Facto Clause by applying newly amended protocols for handling sexually

dangerous persons to him.  The Clause, which states that "[n]o State shall . . . pass any . . . ex

post facto Law, U.S. Const. art. I, § 10, prohibits, inter alia, "'the application of any new

punitive measure to a crime already consummated.'"  Kansas v. Hendricks, 521 U.S. 346, 370

(1997) (quoting California Dept. of Corrections v. Morales, 514 U.S. 499, 505 (1995) (quoting

Lindsey v. Washington, 301 U.S. 397, 401 (1937))).  The Petitioner claims the Commonwealth

acted unlawfully by making changes to its civil commitment statutes and the registration fees

levied upon registered sex offenders.  (Petition ¶ 12.D.)  No such changes would not implicate

the Ex Post Facto Clause, however, because the provisions at issue do not impose punitive

measures.

       In Hendricks, the U.S. Supreme Court outlined a blueprint for analyzing ex post facto

challenges to civil commitment statutes, 521 U.S. at 361-69, which has been followed by the SJC

in rejecting such a challenge to Chapter 123A, the statutory scheme attacked by the Petitioner,

Commonwealth v. Bruno, 432 Mass. 489, 499-502, 735 N.E.2d 1222, 1230-1232 (2000).  The

Hendricks Court concluded that the Clause was not violated by the State of Kansas' application

of a similar civil commitment statute for sexually dangerous persons to one convicted of a child

sex offense.  521 U.S. at 361-69.  Affirming that the Clause "has been interpreted to pertain

exclusively to penal statutes," the Court concluded that the Kansas statute was civil, not penal, in

nature.  Id.  Applying this case law, the SJC found that Chapter 123A "is neither punitive in

intent or effect, nor does it constitute an ex post facto law."  Bruno, 432 Mass. at 492 n.4, 499 &

n. 9, 735 N.E.2d at 1225 n.4, 1230 & n.9 (analyzing statute's compliance with ex post facto

provision of Massachusetts Declaration of Rights, but making clear that conclusion would be

same if federal provision were invoked, because state and federal ex post facto provisions are

treated "in identical fashion"; and finding analysis in Hendricks "instructive," because the

Kansas statute reviewed therein "contain[ed] many provisions similar to those in [M.G.L.] c.

123A").  The SJC's determinations regarding the meaning and effect of Chapter 123A and the

intent of the Massachusetts Legislature should be afforded deference by this Court.  See, e.g.,

Bell v. Maryland, 378 U.S. 226, 241 (1964) ("'[T]he meaning and effect of the state statute . . .

are primarily for the determination of the state court.'" (quoting <u>Missouri ex rel. Wabash R. Co.</u> <u>v. Public Serv. Comm'n</u>, 273 U.S. 126, 131 (1927))); <u>Watson v. Buck</u>, 313 U.S. 387, 396, 401 (1941) (stating that "[u]nless a controlling decision by [the State's] courts compels a different course, the federal courts are not justified in speculating that the state legislature meant exactly the opposite of what it declared 'to have been the legislative intent,'" and that "[t]he [State] Supreme Court . . . under our dual system of government has the last word on the construction and meaning of statutes of that state"). While the SJC's application of federal ex post facto law in other respects may not be binding on this Court, the analysis in <u>Bruno</u> should nevertheless be viewed as instructive, as it is consistent with Supreme Court jurisprudence.

According to the Supreme Court, the initial determination to be made is "whether the legislature meant the statute to establish 'civil' proceedings." <u>Hendricks</u>, 521 U.S. at 361; <u>accord</u> <u>Smith v. Doe I</u>, 538 U.S. 84, 92-106 (2003) (applying <u>Hendricks</u> framework to conclude that Alaska's sex offender registration statute is civil, not punitive, and thus does not violate Ex Post Facto Clause). Such a determination takes into account "the statute's text and its structure," as well as "[o]ther formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes." <u>Smith</u>, 538 U.S. at 92-94 (noting, however, that "[t]he location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one"). The <u>Hendricks</u> Court found that the apparent intent of the Kansas Legislature was to create a civil proceeding, as "evidenced by its placement of the Act within the Kansas probate code, instead of the criminal code, as well as its description of the Act as creating a 'civil commitment procedure,'" combined with the lack of any contrary intent "on the face of the statute." 521 U.S. at 361.

For similar reasons, the <u>Bruno</u> court determined that the intent of the Massachusetts Legislature in enacting the 1999 amendments to Chapter 123A was to establish a civil commitment scheme. 432 Mass. at 500, 735 N.E.2d at 1231. It noted that the challenged amendatory act was "entitled 'An Act ... establishing *civil* commitment.'" <u>Id.</u> (emphasis in original). Following its amendment, the Chapter "retain[ed] its place among public welfare chapters of the General Laws," and "[t]he Legislature left intact the statute's title, 'Care, Treatment and Rehabilitation of Sexually Dangerous Persons.'" <u>Id.</u> Moreover, the statute provided for those within its reach to be "committed to a treatment center providing for their 'care, custody, treatment and rehabilitation.'" <u>Id.</u> (quoting M.G.L. c. 123A, § 2). As the SJC found, "[t]hese facets of the statute, together with its stated purpose, 'to protect forthwith the vulnerable members of our communities from sexual offenders,' underscore the dual goals of the amendments, namely, to protect the public from sexually dangerous persons, and to provide them treatment, and rehabilitation." <u>Id.</u> (citation omitted) (quoting St. 1999, c. 74 emergency pmbl.).

As the <u>Hendricks</u> Court explained, the "manifest intent" of the legislature would only be disregarded "where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil,'" a "heavy burden." 521 U.S. at 361 (alterations in original) (quoting <u>United States v. Ward</u>, 448 U.S. 242, 248-49 (1980)). The Court found this "heavy burden" unmet largely because the statute did "not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." <u>Id.</u> at 361-62. It was not retributive in part "because it [did] not affix culpability for prior criminal conduct," but took such conduct into account "solely for evidentiary purposes, either to demonstrate that a 'mental abnormality' exists or to support a finding of future dangerousness." <u>Id.</u> It also did "not make a criminal conviction a prerequisite

for commitment, a fact "suggest[ing] that the State is not seeking retribution for a past misdeed,"
and did not require a finding of scienter, or criminal intent, which "is customarily an important
element in distinguishing criminal from civil statutes." 521 U.S. at 362 (noting that "the fact that
the Act may be 'tied to criminal activity' is 'insufficient to render the statut[e] punitive'"
(quoting United States v. Ursery, 518 U.S. 267, 269 (1996))). The Court further concluded that
the statute was not designed "to function as a deterrent," because those committed will invariably
be suffering from an abnormality or disorder that "that prevents them from exercising adequate
control over their behavior" and "are therefore unlikely to be deterred by the threat of
confinement." 521 U.S. at 362-63. Even if a deterrent purpose were shown, however, that alone
would not make the statute punitive, as "[a]ny number of governmental programs might deter
crime without imposing punishment." Smith, 538 U.S. at 102.

As the Bruno court found, Chapter 123A likewise lacks any punitive purpose or effect
sufficient to offset the intent of the Legislature. 432 Mass. at 500-02, 735 N.E.2d at 1231-32.
The statute's purpose "is not retributive because 'it does not affix culpability for prior criminal
conduct,'" the SJC stated. Id. at 501, 735 N.E.2d at 1231 (quoting Hendricks, 521 U.S. at 362).
Its requirement "of a conviction of a sexual offense, is not the basis for commitment, but rather
merely identifies and limits the class of persons subject to commitment proceedings under
[Chapter] 123A." Id.; cf. Smith, 538 U.S. at 103 ("The Ex Post Facto Clause does not preclude a
State from making reasonable categorical judgment that conviction of specified crimes should
entail particular regulatory consequences."). Also, "commitment is based on a person's current
mental condition, and no finding of scienter is required." Bruno, 432 Mass. at 501, 735 N.E.2d
at 1231. Furthermore, as was the case in Kansas, the statute did not serve a deterrent purpose,
because "by the nature of their current mental condition, those persons committed under the

statute are 'unlikely to be deterred by the threat of confinement.'" Id. (quoting Hendricks, 521 U.S. at 363).

In Hendricks, the Court further reasoned that the lack of any punitive purpose was demonstrated by the fact that a confined individual was subject to conditions resembling those of patients committed to the state mental institution, not those of state prisoners. 521 U.S. at 363. As it stated, "'the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment.' The State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded." Id. (quoting United States v. Salerno, 481 U.S. 739, 746 (1987)); accord Smith, 538 U.S. at 93, 102-03 (commenting on legitimate objective of imposing "restrictive measures on sex offenders adjudged to be dangerous" and finding that sex offender registration act "has a legitimate nonpunitive purpose of 'public safety'"). The Court dismissed the notion that the potentially indefinite duration of confinement made the statute punitive, because that aspect was consistent with the purpose of holding the person until his abnormality no longer made him dangerous, because the state was statutorily required to release him as soon as he was adjudged non-dangerous, and because the statute established periodic review procedures. Hendricks, 521 U.S. at 363-64. Additionally, the Court found that "the State's use of procedural safeguards traditionally found in criminal trials" did not make the proceedings at issue criminal, but demonstrated the state's "great care to confine only a narrow class of particularly dangerous individuals, and then only after meeting the strictest procedural standards." Id. at 364-65; cf. Smith, 538 U.S. at 96 ("Invoking the criminal process in aid of a statutory regime does not render the statutory scheme itself punitive.").

Further rejected by the <u>Hendricks</u> Court was the argument that the statute "fail[ed] to offer any legitimate 'treatment,'" making confinement under it "little more than disguised punishment."   521 U.S. at 365-68.  The Court indicated that even a scheme primarily designed to segregate sexually violent offenders would be consistent with a legitimate civil procedure, and that treatment did appear to be at least "at least an ancillary purpose" of the statute.  <u>Id.</u>  Finally, the Court reasoned that the statute did not offend the Ex Post Facto Clause because, in addition to its nonpunitive nature, it did "not have retroactive effect," but rather, permitted confinement based on a determination that one currently suffers from an abnormality or disorder and "is likely to pose a future danger to the public."  As noted above, past behavior would only be taken into account for "evidentiary purposes."  <u>Id.</u> at 371.

The Massachusetts scheme closely resembles the Kansas statute in these aspects as well. It is not designed to treat those committed as confined criminal offenders, but to segregate them in a "treatment center" due to their dangerous tendencies and release them as soon as it safe to do so.  <u>Bruno</u>, 432 Mass. at 500-02, 735 N.E.2d at 1231-32.  As the <u>Bruno</u> court observed, "those persons subjected to confined commitment have been found either to be 'likely to engage in sexual offenses if not confined to a secure facility,' or to have 'a general lack of power to control . . . sexual impulses . . . and . . . likely to attack or otherwise inflict injury.'  Thus, because such persons are likely to commit future harm, confined commitment appears to be the only viable form of commitment."  <u>Id.</u> at 502, 735 N.E.2d at 1232 (citations omitted & alterations in original) (quoting M.G.L. c. 123A, § 1).  While "treatment for committed persons is provided at a treatment center operated under the auspices of the department of correction . . . sexually dangerous persons are kept apart from the criminal population in the treatment center. . . . [T]hey only can remain committed while they possess the requisite mental condition.  If the trier

35

of fact finds that a person is no longer sexually dangerous, the department of correction must release that person." Id.

The same conclusion must be reached with respect to the imposition of a new fee upon registered sex offenders by way of a change to the relevant regulations. See 803 C.M.R. § 1.28 (providing for $75 registration fee). The Supreme Court addressed fees of this type in rejecting a double jeopardy challenge to the imposition of monetary penalties by the Office of the Comptroller of the Currency upon those who violate certain federal statutes. Hudson v. United States, 522 U.S. 93, 102-104 (1997). There the Court found that such penalties were civil, not punitive, in nature, for the following reasons: authority to impose such penalties was vested in an administrative body; "the payment of fixed or variable sums of money" has long been recognized as civilly enforceable; the penalties involve no affirmative disability or restraint; they do not arise from a finding of scienter, but from a statutory violation. Id. The Court rejected the notions that the penalties were punitive merely because they served a deterrent effect, reasoning that all civil penalties involve some element of deterrence, but they may also serve other regulatory goals. Id. Each of these factors applies equally to the administratively imposed registration fee for registered sex offenders. Thus, any changes thereto would not violate the Ex Post Facto Clause.

Reading the Petitioner's ex post facto claim as challenging the above provisions only as it "is applied" to him would not salvage the claim. (Petition § 12.D (using phrase "unconstitutionally as applied").) If found to be civil, a provision "cannot be deemed punitive 'as applied' to a single individual in violation of the . . . *Ex Post Facto Clause[]* and provide cause for release." Seling v. Young, 531 U.S. 250, 262-63, 267 (2001) (noting that allowing "as applied" challenges would be unworkable and "[t]he civil nature of a confinement scheme

cannot be altered based merely on vagaries in the implementation of the authorizing statute"; and rejecting ex post facto challenge to Washington civil commitment statute for sexually violent predators).

Application of the Supreme Court's criteria for distinguishing civil from penal statutes compels the conclusion that the Massachusetts civil commitment statute and registration fees are civil in nature. Their application to the Petitioner thus cannot be found to violate the Ex Post Facto Clause.

**IV.    The SJC's decisions on the claims before it neither were contrary to nor involved unreasonable applications of established federal law.**

To the extent that the Petitioner is allowed to incorporate the claims that he presented to the SJC, despite the procedural issues raised <u>supra</u> Section I, such claims could not be found to warrant habeas relief. Title 28, Section 2254 of the U.S. Code provides as follows concerning challenges to state convictions:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision will only be found "contrary to" established federal law where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court precedent or "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).

The decision will be determined to be "an unreasonable application" of Supreme Court case law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Id. at 407-09. "The ultimate question . . . is not how well reasoned the state court decision is, but whether the outcome is reasonable." Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001) (adding that "even a poorly reasoned state opinion does not mean that the outcome represents an unreasonable application"). A decision that is incorrect does not necessarily rise to level of being unreasonable. Williams, 529 U.S. at 365 ("[T]he most important point is that an unreasonable application of federal law is different from an incorrect application of federal law.").

In the instant case, the SJC cannot be found to have rendered any decision that was contrary to or involved an unreasonable application of established federal law.

**A.    The Petitioner's request for relief due to the alternate juror's brief presence in the jury room was not based on, and would not have been supported by, federal law.**

The Petitioner has no grounds for challenging the SJC's determination that the alternate juror's brief presence at the commencement of jury deliberations did not constitute an intolerable intrusion upon the jury. First, this issue was presented to and decided by the SJC based solely upon state law grounds. Casey, 442 Mass. at 4-7, 809 N.E.2d at 983-85 (discussing Petitioner's challenge based on Massachusetts Declaration of Rights, and citing state cases). (Pet'r's Br. to Appeals Ct./SJC at 15-26 (invoking Massachusetts Constitution, cases, and procedural rule).) It is clear that "'federal habeas corpus relief does not lie for errors of state law.' . . . [Thus], it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764 (1990)).

Second, even if the Petitioner's claim could be viewed as alleging a violation of his due process rights under the U.S. Constitution's Fourteenth Amendment, or his rights under the Sixth and Fourteenth Amendments to a fair trial by an impartial jury based on the evidence, and to confront the witnesses against him, his claim must fail. The SJC's determination was fully consonant with Supreme Court precedent.

In fact, its approach was quite consistent with that of the Supreme Court in a case remarkably similar to the one at bar. See United States v. Olano, 507 U.S. 725, 737-41 (1993). In Olano, the Court concluded that, absent a showing of prejudicial impact, any error arising from the presence of alternates at jury deliberations would not be found to "'affect[] substantial rights' within the meaning of [Fed. R. Crim. P. 52(b)]," which "provides court[s] of appeals a limited power to correct errors that were forfeited because not timely raised in district court." Id. at 731. The Court reached this conclusion by construing and applying its "intrusion jurisprudence" that has arisen from challenges on constitutional grounds. Id. at 738 (noting that both analysis in Rule 52 context and analysis of constitutional claims rely on determinations of prejudicial impact).

In its past "intrusion" cases, the Court commented, it "generally [has] analyzed outside intrusions upon the jury for prejudicial impact." Id. at 738. As the Court reasoned, "[a]lthough the presence of alternate jurors does contravene 'the cardinal principle that the deliberations of the jury shall remain private and secret,' the primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence. '[I]f no harm resulted from this intrusion [of an alternate juror into the jury room,] reversal would be pointless.'" Id. at 737-38 (citations omitted) (second and third alterations in original) (quoting in the first instance Fed. R. Crim. P. 23(b) advisory comm. notes (quoting United States v. Virginia Erection Corp.,

335 F.2d 868, 872 (4th Cir. 1964)), and quoting in the second instance United States v. Watson,

669 F.2d 1374, 1391 (11th Cir. 1982)).

The Court found the following language in Smith v. Phillips to accurately summarize

such jurisprudence:

> "[D]ue process does not require a new trial every time a juror has been
> placed in a potentially compromising situation.  Were that the rule, few
> trials would be constitutionally acceptable. . . .  [I]t is virtually impossible
> to shield jurors from every contact or influence that might theoretically
> affect their vote.  Due process means a jury capable and willing to decide
> the case solely on the evidence before it, and a trial judge ever watchful to
> prevent prejudicial occurrences and to determine the effect of such
> occurrences when they happen."

Id. at 738 (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982) (alterations in original)).

The Court made clear that, even where prejudice is "presumed," the same analysis of

impact must be performed.  Id. at 739.  "There may be cases where an intrusion should be

presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not

change the ultimate inquiry:  did the intrusion affect the jury's deliberations, and thereby its

verdict?  We cannot imagine why egregious comments by a bailiff to a juror (Parker) or an

apparent bribe followed by an official investigation (Remmer) should be evaluated in terms of

'prejudice,' while the mere presence of alternate jurors during jury deliberations should not."

Id. (citations omitted) (emphasis in original) (referring to Parker v. Gladden, 385 U.S. 363

(1966), and Remmer v. United States, 347 U.S. 227 (1954)).

The Court also declined to "presume prejudice" for purposes of analyzing the issue

before it:

> The Court of Appeals was incorrect in finding the error "inherently
> prejudicial."  Until the close of trial, the 2 alternate jurors were
> indistinguishable from the 12 regular jurors.  Along with the regular
> jurors, they commenced their office with an oath, received the normal
> initial admonishment, heard the same evidence and arguments, and were

> not identified as alternates until *after* the District Court gave a final set of
> instructions.  In those instructions, the District Court specifically enjoined
> the jurors that "according to the law, the alternates must not participate in
> the deliberations," and reiterated, "we are going to ask that you not
> participate." . . .  Nor do we think that the mere presence of alternate
> jurors entailed a sufficient risk of "chill" to justify a presumption of
> prejudice on that score.

Id. at 740-41 (citations omitted & emphasis in original).

The Court acknowledged that "[i]n theory, the presence of alternate jurors during jury

deliberations might prejudice a defendant in two different ways:  either because the alternates

actually participated in the deliberations, verbally or through 'body language,' or because the

alternates' presence exerted a 'chilling' effect on the regular jurors," but it found that the

defendants had "made no specific showing" of such participation or chilling effect.  Id. at 739

(citations omitted).

Like the Olano Court, the SJC in the Petitioner's case focused on whether any prejudicial

impact had resulted from the alternate's presence.  Casey, 442 Mass. at 4-7, 809 N.E.2d at 983-

85 ("Because the defendant failed to show that this minor intrusion by the alternate juror

amounted to prejudice, the judge abused his discretion by allowing the motion for a new trial.").

It too rejected the notion that prejudice should be presumed, reasoning that such a presumption is

unwarranted "[w]here an alternate juror is in the jury room for only a brief period of time."  Id. at

4-6, 809 N.E.2d at 983-84.  The court highlighted the unique circumstances of the Petitioner's

case:

> Here the alternate juror was present for approximately two minutes at the
> very start of deliberations.  Unlike the cases on which the defendant relies,
> it cannot be presumed that the alternate juror's presence here constituted
> an external influence that amounted to prejudice.  This is especially so
> where the jury were nine to three in favor of acquittal four hours after the
> alternate juror had been in the jury room.

Id. at 5, 809 N.E.2d 983-84 (citation omitted).  The situation here was in no way comparable to those situations found to warrant relief in prior Supreme Court cases.  See, e.g., Parker, 385 U.S. at 364-66 (finding prejudice where bailiff who was assigned to shepherd jurors and had "official character . . . as an officer of the court as well as the State" stated to jurors that defendant was guilty and any erroneous guilty verdict would be corrected by Supreme Court); Turner v. Louisiana, 379 U.S. 466, 467-74 (1965) (finding "extreme prejudice" where sequestered jurors were escorted by, were driven by, ate with, conversed with, relied on for errands, and continuously and intimately associated with two deputy sheriffs who were also the key witnesses for the prosecution); Remmer, 347 U.S. at 228-30 (remanding case to district court for hearing on harmfulness, where juror was told by third party that he could profit by finding for defendant and was then investigated by F.B.I., and noting that "private communications" with a juror about a case during trial are "presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial," unless government meets burden of showing that contact was harmless). Though not mentioned by the SJC, the Olano Court's reasoning regarding the equal treatment of the jurors and alternate applies with equal force here.   That is, at the point when the alternate entered the jury room, he had taken the same oath, received the same instructions, and heard the same evidence and arguments as all the other jurors.  He was not even named as the alternate until immediately before the jury retired for its initial deliberations.  (Tr. Bristol Trial at III: 71.)

The SJC acknowledged that a criminal defendant "may show that an alternate juror did in fact expose the jury to extraneous matter, namely, 'specific facts not mentioned at trial concerning one of the parties or the matter in litigation.'"  Casey, 442 U.S. at 5-6, 809 N.E.2d at 984 (quoting Commonwealth v. Fidler, 377 Mass. 192, 200, 385 N.E.2d 513 (1979)).  However,

as in <u>Olano</u>, there had been no showing of such exposure.  <u>Id.</u>  While the Petitioner had the right

"to move for a mistrial and request a voir dire to determine what the alternate juror asked the

deliberating jurors," he waived such right by failing to do so, the court observed.  <u>Id.</u>  Even if the

Petitioner had made such a showing, it would not have warranted the new trial he requested.  <u>See</u>

<u>Smith</u>, 455 U.S. at 216, 217 (indicating that "due process does not require a new trial every time

a juror has been placed in a potentially compromising situation," and noting that even where

prejudice was presumed in <u>Remmer</u>, "the Court did not require a new trial," but only a hearing).

    The SJC's handling of the Petitioner's claim was thus in harmony with Supreme Court

jurisprudence.

**B.    <u>The SJC's determination that the victim's conduct did not intolerably interfere with the Petitioner's right to a fair jury trial was consistent with established federal law.</u>**

    Similarly, the SJC's determination that the victim's antics before the jury and

communication with the alternate "did not amount to an unwarranted intrusion that constituted

an extraneous influence on the jury" was not inconsistent with Supreme Court case law.  <u>Casey</u>,

442 Mass. at 8, 809 N.E.2d at 985.  No showing of prejudice, as required by <u>Olano</u>, could be

made here.  507 U.S. at 737-41.  As the SJC noted, "[n]othing in the record suggests that the

victim said anything to the jurors at the time."  <u>Casey</u>, 442 Mass. at 7, 809 N.E.2d at 985.  The

court also reached the reasonable conclusion that, because the victim "'look[ed] and act[ed]

much younger than his actual age,' . . . the nature of the incident was sufficiently innocent that it

likely did not prejudice the defendant's right to a fair trial."  <u>Id.</u>  As with the alternate's presence

in the jury room, the circumstances here are quite different from those in <u>Parker</u>, 385 U.S. at

364-66 (involving bailiff's comments to jurors about defendant's guilt); <u>Turner</u>, 379 U.S. at 467-

74 (involving key prosecution witnesses as escorts for sequestered jurors); and <u>Remmer</u>, 347

U.S. at 228-30 (involving possible offer to bribe juror, followed by F.B.I. investigation). Moreover, the Petitioner received "all the relief he requested" in the form of an admonishment to the victim by the judge. Id.

The Petitioner's claim based on the communication between the victim and the alternate in the courthouse hallway can be disposed of even more easily. As the SJC noted, the communication "could not have affected the verdict because it occurred after the alternate juror had been segregated from the jury." Casey, 442 Mass. at 8, 809 N.E.2d at 985. Thus, the situation did not even involve the type of "'potentially compromising situation'" referenced in Olano, 507 U.S. at 738 (quoting Smith, 455 U.S. at 217), or the "'private talk,' tending to reach the jury by 'outside influence'" with which the Court was concerned in cases such as Parker, 385 U.S. at 364 (quoting Patterson v. Colorado, 205 U.S. 454, 462 (1907)).

The SJC ruled consistently with established federal law in rejecting the Petitioner's claim arising from these two incidents.

C.    **The Petitioner's challenge to the weight of evidence based on questions about the victim's credibility was properly disposed of by the SJC and cannot be entertained here.**

The Petitioner's claim that "the weight of the evidence does not support a conviction because the victim had a motive to accuse the defendant falsely and gave inconsistent accounts" cannot be entertained here. Casey, 442 Mass. at 3, 8-9, 809 N.E.2d at 982, 985-86. First, his challenge to the evidence is based solely on questions about the veracity of the victim's testimony. Id. (See also Pet'r's Br. to Appeals Ct./SJC at 33-36.) Such issues of witness credibility are inappropriate for review by a federal district court in a habeas action. See, e.g., Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (stating that federal courts had "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court,

but not by them" under former version of 28 U.S.C. § 2254(d), which established presumption of

correctness for state court determinations of merits of factual issue with exceptions for, inter alia,

instance where habeas court concludes that factual determination is not fairly supported by

record); Mastracchio, 274 F.3d at 598 (stating that, under current version of 28 U.S.C. § 2254, "a

federal habeas court ordinarily refrains from revisiting credibility determinations as 'it would be

wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve

into the veracity of the witnesses on habeas review'" (quoting Sanna v. Dipaolo, 265 F.3d 1, 10

(1st Cir. 2001) (involving petitioner who made no showing of "'clear and convincing evidence'"

of incorrect factual determination, but "simply insist[ed] that [a witness'] testimony was

untrustworthy")).  This rule is consistent with the widely-accepted principle that "[c]redibility is

quintessentially a matter of fact, reserved in almost every circumstance for the trier."  Sanna, 265

F.3d at 10.  It is also equivalent to the state rule on which the SJC relied in rendering its decision.

Casey, 442 Mass. at 8-9, 809 N.E.2d at 986 (reasoning that "[c]redibility is an issue for the jury

to decide," and "[w]hether the verdicts are against the weight of the evidence is a determination

best left to the trial judge, who heard the witnesses and observed them testify," and citing state

cases).  It should be followed here.

     Second, even if the Petitioner's challenge to the evidence could be considered in this

action, it would be lacking in merit.  As noted above, the Petitioner's allegations that the victim

had ulterior motives and testified inconsistently were squarely placed before the jury through

effective cross-examination of the victim by the Petitioner's counsel.  (Tr. Bristol Trial at II:

121-76.)  Moreover, while the victim may have been inconsistent in reporting certain details, he

was consistent about the fact that he was sexually abused by the Petitioner.  (Tr. Bristol Trial at

II: 77-176.)  The jury had the ability to weigh all of these factors, and the conclusion they reached is clear from their verdict.

> **D.    The SJC's rejection of the Petitioner's ineffective assistance claims was warranted by Supreme Court precedent and the circumstances of the Petitioner's criminal case.**

There is no support for the Petitioner's claims that his trial counsel was ineffective for failing to investigate the possibility that the victim suffered from bipolar disorder like his half-brother ("C.S." or the "half-brother"), and failing to request a more thorough inquiry regarding the victim's antics before the jury and communications with the alternate juror.  The SJC's rejection of his claims were thus warranted by the record and consistent with Supreme Court jurisprudence.

> A.    The standards for showing ineffective assistance

In Strickland, The Supreme Court set forth definitive standards for evaluating ineffective assistance claims based on the conduct of counsel.  466 U.S. 668.[7]  There the court explained that a criminal defendant is deprived of the right to the effective assistance of counsel where his attorney fails "to render 'adequate legal assistance,'" that is, where "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Id. at 686 (quoting Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)).  This standard consists of "two components":

---

[7] As noted supra Section III.A, a criminal defendant may also be deprived of the right to the effective assistance of counsel where he has been "actual[ly] or constructive[ly] deni[ed] . . . the assistance of counsel altogether," where "counsel's assistance was rendered ineffective by a conflict of interest," or where the government "interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense."  Strickland, 466 U.S. at 683, 686, 692.  However, none of the Petitioner's ineffective assistance claims can re read as advancing any such allegations.  (Petition ¶ 12; Pet'r's Br. to Appeals Ct./SJC.)

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

With respect to the first component, "the proper standard for attorney performance is that of reasonably effective assistance." Id. Thus, to succeed on an ineffective assistance claim, "the defendant must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms . . . considering all the circumstances." Id. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made . . . to evaluate the conduct from counsel's perspective at the time." Id. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955), and noting "the wide latitude counsel must have in making tactical decisions").

The second component discussed in Strickland requires a criminal defendant alleging ineffective assistance to "affirmatively prove" that an error by counsel was "prejudicial to the defense," that is, that it had an "effect on the judgment." Id. at 691-93 (stating further that "the defendant must show that [counsel's errors] actually had an adverse effect on the defense"). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. "The defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694-95 (noting that "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt").

As made clear in Strickland, a court evaluating such a claim should give no consideration to a criminal defendant's argument that the judge or jury, in addition to his counsel, acted improperly:

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.  An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.  A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.  The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.

Id.  A court making a prejudice evaluation must also "consider the totality of the evidence before the judge or jury . . . [t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings."  Id. at 695-96.

B.    The mental condition of the half-brother and the victim

The SJC's rejection of Petitioner's claim that his counsel was ineffective for failing to investigate the mental condition of the victim and his half-brother was neither contrary to nor an unreasonable application of the standards set forth in Strickland.   Such standards "require no special amplification in order to define counsel's duty to investigate . . . . [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Id. at 690-91.  The reasonableness of counsel's conduct depends largely upon the information provided to him by his client:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example,  . . . when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

In light of the above principles, any failure to investigate here cannot be considered unreasonable.  First, the Petitioner has made no showing that any information regarding the half-brother's mental condition or his precise relation to the victim was made available to Petitioner's counsel sufficiently in advance of trial.  The Petitioner's trial counsel must have learned of the half-brother's condition at some point prior to trial, because he cross-examined the victim's and half-brother's mother about this subject (Tr. Bristol Trial at II: 205, 213), and he submitted an affidavit in support of the Petitioner's Motion for a New Trial that made reference to such information (Aff. of Cruz ¶ I).  However, his affidavit reflects a lack of certainty on his part about exactly when and how he learned such information.  (Id. ("I do not know whether the victim suffers from the same bi-polar condition as does his half-brother [C.S.]  I seem to recall that the information regarding the victim appears in the Department of Social Services records, but I am not sure.").)

In fact, other parts of the record suggest that defense counsel may not have been alerted to such information much in advance of trial.  The Petitioner himself stated in an affidavit

accompanying his State Appellate Brief that he did not learn of the half-brother's bipolar

disorder until trial.  (Aff. of Casey ¶ 33.)  That is believable.  According to witness testimony,

the half-brother left the building where the victim and the Petitioner lived in approximately 1988

(Tr. Bristol Trial II: 186 (testimony of A.V.'s and C.S.'s mother that C.S. left home about eleven

years earlier, when A.V. was three or four)), and did not return until December of 1997 or

January of 1998.  (Tr. Bristol Trial II: 114 (testimony of A.V. that C.S. returned in December

1997), 187 (testimony of A.V.'s and C.S.'s mother that C.S. returned on January 24, 1998).)  For

years during his absence, he had no contact with his family.  (Tr. Bristol Trial at II: 114

(testimony of A.V. that he did not see half-brother for about ten or eleven years between half-

brother's placement in foster case and his visit to family in December 1997, at which point A.V.

did not recognize him), 169-70 (testimony of A.V. that he did not remember half-brother living

in house up until A.V. was around four, and he did not see or talk to him until his 1997 return),

187 (testimony of A.V.'s and C.S.'s mother that she had no contact with C.S. between 1990 or

1991 and January 24, 1998, at which point she did not recognize him).)  As a result, even his

own mother did not know of the half-brother's bipolar condition until October or November of

1998 (Tr. Bristol Trial at II: 204-05 (testimony of A.V.'s and C.S.'s mother that she had no

knowledge of what was happening in C.S.'s life while she was out of contact with him, and that

she first learned of his bipolar condition in October or November of 1998)).  That was more than

eight months after the Petitioner left the building.  (Tr. Bristol Trial II: 109-10 (testimony of

victim that Petitioner left building in 1997), 191 (testimony of A.V.'s and C.S.'s mother that

Petitioner left building on January 25, 1998)).  It was thus highly unlikely that the Petitioner

knew of the half-brother's bipolar condition before trial.  As a result, it was equally unlikely that

the Petitioner's counsel would have received information concerning the half-brother's condition from his client or others well in advance of trial.

Even if the Petitioner's trial counsel had learned of the half-brother's condition, he may have been misled by his own client about the precise relationship between the half-brother and the victim. Notably, in the Petitioner's pro se filings in the instant case, he refers to the half-brother as being the victim's step-brother. (Pet'r's Mem. Supp. Petition at ii[A] (referring to the possibility that the victim "suffers from a bipolar disorder like his brother (step) [sic]"). This, combined with the fact that the same error was included in state trial and appellate briefs filed by counsel other than the Petitioner's trial counsel, suggests that the Petitioner referred to the half-brother as being the victim's step-brother when communicating with counsel generally. (Pet'r's Br. to Appeals Ct./SJC at i-iii, 1, 5-7, 14, 33-34, 37, 39-41 (referring repeatedly to victim's "stepbrother"); Pet'r's Mot. New Trial at 6, 22-23, 28 (referring to half-brother as victim's "stepbrother," "half-brother," and "brother").) The Petitioner's defense counsel would not necessarily have had any reason to question such information, given that the victim and the half-brother had different surnames (Tr. II: 177, 186 (testimony of A.V.'s mother regarding sons' full names).). More importantly, he would have had no reason to investigate whether the victim suffered from bipolar disorder, as there would have appeared to be no genetic link between the two youths. While half-brothers are those "who have the same father, but different mothers; or the same mother, but different fathers," a step-relationship "is repugnant to blood relationship, and is indicative of a relationship by affinity." Black's Law Dictionary 714, 1413 (6th ed. 1990).

Thus, to the extent that any "information supplied by the defendant" to his defense counsel was incorrect or gave "counsel reason to believe that pursuing [such an] investigation[] would be fruitless," counsel's failure to investigate "may not . . . be challenged as unreasonable."

Strickland, 466 U.S. at 691.  Indeed, at least one Court of Appeals applying Strickland has

concluded that counsel is not ineffective for failing to verify inaccurate information provided by

his client that he had no reason to question.  Johnson v. Cabana, 805 F.2d 579, 580-82 (5th

Cir.1986) (determining that Strickland compels conclusion that "if counsel receives information

from his client, the accuracy of which counsel has no reason to doubt, it will ordinarily be

unnecessary for counsel to verify the information from an alternate source even if the

information from that source is readily available," and thus rejecting ineffective assistance

claim).

     The Petitioner also cannot show that his case was prejudiced by any failure to investigate

the mental health of the two youths, largely for the reasons recognized by the SJC.   There was

no evidence that the victim actually had bipolar disorder, displayed symptoms of the disorder, or

would have been rendered unreliable as a witness if he did have it.  Casey, 442 Mass. at 9-10,

809 N.E.2d at 986-87.  Also, "the record does not indicate that a motion for production of the

victim's medical records would have met the requirements of Commonwealth v. Bishop, 416

Mass. 169, 181-182, 617 N.E.2d 990 (1993)."  Id. (citations omitted).  Furthermore, though not

mentioned by the SJC, defense counsel did in fact bring the half-brother's bipolar condition and

his difficulties distinguishing between fantasy and reality to the attention of the jury in cross-

examining the victim's and half-brother's mother.  (Tr. Bristol Trial at II: 205 (testimony elicited

from A.V.'s and C.S.'s mother on cross-examination that C.S. had bipolar disorder and problems

distinguishing between fantasy and reality, 213 (testimony elicited from mother on cross-

examination that C.S. had medical problems, in response to question about him being fantasizer

who had difficulty dealing with reality).)  In light of the lack of any showing of deficient

performance or prejudice, the SJC's conclusion that the Petitioner was not denied the effective

assistance of counsel could not be found to have been contrary to or an unreasonable application
of Supreme Court precedent.

C.    Counsel's failure to demand a more thorough inquiry regarding the
victim's antics and communication with the alternate

The SJC also ruled in accordance with Supreme Court precedent in rejecting the

Petitioner's claim that his counsel was ineffective for failing to demand a more thorough inquiry

concerning the victim's antics before the jury and his communication with the alternate juror.

With respect to the victim's antics, defense counsel could not have been expected to

lodge an objection as such conduct was occurring, because the victim was behind him and thus

out of his view.  (Aff. of Cruz ¶ C ("That portion of the courtroom was behind me so I had not

previously noticed [the victim] sitting [next to the jury box].").)  When the victim's conduct was

finally brought to defense counsel's attention, he did object and "requested that the judge direct

the victim to move away from the jury in the event that the jury returned to the court room for

any reason other than to render a verdict."  Casey, 442 Mass. at 7, 809 N.E.2d at 985.  The judge

then sternly admonished the victim.  Id.

There were at least two valid justifications for defense counsel's failure to request a more

intensive inquiry.  First, he could reasonably have concluded that such an inquiry would have

been deemed unwarranted under the circumstances.  "Nothing in the record suggest[ed] that the

victim said anything to the jurors at the time" and defense counsel observed that the victim

"'look[ed] and act[ed] much younger than his actual age.'"  Id. at 7, 809 N.E.2d at 985 (See also

Aff. of Cruz ¶ E).  He thus would have been justified in believing, as did the SJC, that "the

nature of the incident was sufficiently innocent that it likely did not prejudice the defendant's

right to a fair trial."  Casey, 442 Mass. at  7, 809 N.E.2d at 985.  Indeed, a request for

admonishment of the victim before the jury and a corresponding jury instruction "could have

been viewed as an overreaction by counsel to what was nothing more than innocuous childlike behavior." Id. at 8, 809 N.E.2d at 985.

Second, and perhaps more importantly, the victim's actions in the presence of the jury were not revealed until the second day of jury deliberations, one day after "the jury reported that they were deadlocked at nine to three in favor of acquittal." Id. at 3, 7, 809 N.E.2d at 982, 985. (See also Aff. of Cruz ¶¶ B, C (memorializing his recollections that jury was nine-to-three to acquit and that "the victim's close proximity to the jury came to [his] attention when the jury were deadlocked").) Thus, defense counsel may have decided to avoid any action that might prompt a mistrial in light of the jury's revelation of its leanings.

A decision based on either of the above rationales "'might be considered sound trial strategy,'" and is thus entitled to deference. Strickland, 466 U.S. at 689 (quoting Michel, 350 U.S. at 101). Accordingly, the SJC's rejection of his ineffective assistance claim was not at odds with established federal law.

The charge that defense counsel was ineffective for failing to pursue the issue of the victim's communication with the alternate has even less merit. As noted supra Section IV.B, this communication "occurred after the alternate had been segregated from the jury." Casey, 442 Mass. at 8, 809 N.E.2d at 985. Accordingly, the SJC's conclusion that the communication "could not have affected the verdict" cannot be challenged, and its failure to find that the incident gave rise to an ineffective assistance claim comports with Supreme Court precedent. Id.; cf. Strickland, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."); Lockhart v. Fretwell, 506 U.S. 364, 382 (1983) (Stevens, J., joined by Blackmun, J., dissenting) ("[I]neffective-assistance

54

claims predicated on failure to make wholly frivolous or unethical arguments will generally be dispensed with under <u>Strickland</u>'s first prong, without recourse to the second.").  This claim of ineffective assistance, like the Petitioner's other claims, is unsustainable.

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of the Respondent on all of the Petitioner's claims.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

 /s/ Randall E. Ravitz
Randall E. Ravitz (BBO # 643381)
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts  02108
(617) 727-2200, ext. 2852

Dated:  April 11, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on April 11, 2005, by first class mail, postage prepaid, upon:

Stephen John Casey, Sr.
W-67232
North Central Correctional Institute
500 Colony Road
P.O. Box 466
Gardner, MA  01440

pro se

 /s/ Randall E. Ravitz
Randall E. Ravitz